**UNITED STATES of America**

v.

**Rocco Ernest INFELISE, Salvatore DeLaurentis, et al.**

**No. 90 CR 87.**

United States District Court,
N.D. Illinois, E.D.

Jan. 14, 1993.

David D. Buvinger, Mitchell Mars, Asst. U.S. Attys., Chicago, IL, for United States.

Patrick A. Tuite, Chicago, IL, for Rocco Ernest Infelise.

Allan A. Ackerman, Chicago, IL, for Salvatore DeLaurentis.

## MEMORANDUM OPINION AND ORDER

ANN CLAIRE WILLIAMS, District Judge.

On March 10, 1992, defendant Rocco Ernest Infelise was found guilty on Counts 1–2, 6–7, 12–17, and 33–42 of the indictment.[1] Defendant Salvatore DeLaurentis was found guilty on Counts 1, 2, 7, 8, 19, 20–24, and 33–42, and not guilty on Count 3. Specifically, in Count 1, DeLaurentis was found guilty of all the charged racketeering acts and unlawful debts except Racketeering Act 17(a) which charged DeLaurentis with conspiring to murder Hal Smith. The jury found DeLaurentis not guilty of that racketeering act. However, DeLaurentis was convicted on Count 8 which charged him with conspiring to murder the same Hal Smith for the purpose of maintaining the business of the Ferriola Street Crew, an enterprise engaged in racketeering activity.[2]

This case is currently before the court on Infelise's motion to interview jurors regarding extraneous prejudicial information, DeLaurentis' post trial motion regarding juror written communication with the trial court,[3] and DeLaurentis' motion to vacate his conviction on Count 8 and declare a

---

1. Specifically, as to Count 1, Infelise was found guilty of all charged unlawful debts and Racketeering Acts 5(a)–(c), 6–7, 10(a)–(b), 11(a)–(b), 17(a), 24, and 26. Infelise was found not guilty of Racketeering Acts 8 and 9(a), and the jury could not reach a verdict on Racketeering Act 17(b). The jury also could not reach verdicts on Counts 8–9.

2. Defendants DeLaurentis, Infelise, Louis Marino, Robert Salerno, and Robert Bellavia were charged in Count 1 with Racketeering Act 17(a) for conspiring to murder Hal Smith. The jury found DeLaurentis not guilty, and Infelise and Bellavia guilty of this racketeering act. The jury could not reach a verdict on this act for Marino and Salerno and a mistrial was declared.

 Defendants Infelise, Marino, Salerno, and Bellavia were charged in Count 1 with Racketeering Act 17(b) for agreeing to murder Hal Smith.

The jury could not reach a verdict on this racketeering act for any of these defendants and a mistrial was declared.

 Defendants DeLaurentis, Infelise, Marino, Salerno, and Bellavia were charged with Count 8 for conspiring to murder Hal Smith. The jury found DeLaurentis guilty of this count, and could not reach a verdict on this count with respect to the other defendants and a mistrial was declared.

 Defendants Infelise, Marino, Salerno, and Bellavia were charged with Count 9 for kidnapping and murdering Hal Smith. The jury could not reach a verdict on this count for any of these defendants and a mistrial was declared.

3. For simplicity, this court will refer to Infelise's and DeLaurentis' motions as "motions to interview jurors."

mistrial. For the reasons stated below, Infelise's and DeLaurentis' motions to interview jurors are denied. DeLaurentis' motion to vacate his conviction on Count 8 is granted.

### Background

Jury selection began in this case on October 23, 1991 and closing arguments were completed on Monday, March 2, 1992. The jury was instructed on the same day and began deliberating on Tuesday, March 3, 1992. Late Monday afternoon, March 9, 1992, the jury sent a note to this court stating that they "had reached a verdict on a number of counts" but that there were "a few counts that we can't come to a unanimious [sic] verdict on." On the morning of Tuesday, March 10, 1992, after conferring with counsel, the court read the *Silvern* instruction and instructed the jury to continue its deliberations.[4] Approximately 20 minutes after returning to the jury room, the jury sent out another note stating that they were deadlocked and could not reach a verdict with respect to certain counts. With the agreement of counsel, the court asked each juror whether a verdict could be reached with further deliberations. Each juror responded that a verdict could not be reached.

After a short recess, the court read the jury's verdict in open court and the verdict forms were given to the defense attorneys for review. Before the jurors were polled, defense counsel requested a recess to discuss the verdict forms. When the proceedings were reconvened, DeLaurentis' attorney, Mr. Bruce Cutler, requested a side bar with the court. At side bar, Mr. Cutler

noted that the jurors found that DeLaurentis had "not agreed" to conspiring to murder Hal Smith as a racketeering act as charged in Racketeering Act 17(a), but "guilty" of conspiring to kill Hal Smith as charged in Count 8. Mr. Cutler asked the court to question the jury to see if an error was made in marking the verdict form. At a lengthy sidebar conference, government and defense counsel discussed how the court could pose a question without suggesting that the jury had in fact made a mistake. Some of the pertinent discussion follows:

\* \* \* \* \* \*

Mr. Cutler: In other words, Judge, you can say, *"Now, as to Count 8, which is the conspiracy to murder Al [sic] Smith, we have guilty. Is that your vote?"* You can do it like that, a prophylactic measure, so I'd know.

Mr. Mars: *I guess my concern is, if that is the only one we draw their attention on, they could say everybody is happy on all but this, and that you're questioning their judgment on this particular one.*

Mr. Simone: That is not particularly true. We're not happy with the verdicts.

\* \* \* \* \* \*

Mr. Simone: *Even if you look at 17(a), you find "agreed," and then you look at 8 you find—what I'm saying, your Honor, is that I think that should be addressed to the Court later.* I don't know what the government is going to do, have a retrial or what. We have a lot of problems that could be resolved later. I think that since Mr. Cutler wants to

---

**4.** The *Silvern* instruction provides:

The verdict must represent the considered judgment of each juror. Your verdict, whether it be guilty or not guilty, must be unanimous.

You should make every reasonable effort to reach a verdict. In doing so, you should consult with one another, express your own views, and listen to the opinions of your fellow jurors. Discuss your differences with an open mind. Do not hesitate to re-examine your own views and change your opinion if you come to believe it is wrong. But you should not surrender your honest beliefs about the weight or effect of evidence solely

because of the opinions of your fellow jurors or for the purpose of returning a unanimous verdict.

The twelve of you should give fair and equal consideration to all the evidence and deliberate with the goal of reaching an agreement which is consistent with the individual judgment of each juror. You are impartial judges of the facts. Your sole interest is to determine whether the government has proved its case beyond a reasonable doubt.

Federal Criminal Jury Instructions of the Seventh Circuit 7.06 (patterned after *United States v. Silvern,* 484 F.2d 879 (7th Cir.1973)).

clarify the situation and correct the mistake, if one was made, if they meant what they did, then he's got to live with that.

\* \* \* \* \* \*

Mr. Cutler: *You can come out and say, "I see you found 17(a) not agreed and guilty on Count 8 regarding conspiracy, regarding the murder of Al [sic] Smith, is that your verdict?"*

The Court: Well, I was thinking of a better way, and a way to get around it in a different way would be, "Ladies and gentlemen, we just want to verify the counts on which you hung," and I'm just trying to think of a way to finesse it.

Mr. Simone: *I don't like that at all, Judge. I think the polling would be as to the counts which were decided either way.*

The Court: The only way you could do it is to send them back and say the—see, I don't know how the jury would read this. I just can't think of a way to say, "Ladies and gentlemen, check the verdict form and make sure you did it right."

Mr. Cutler: *No, I know, but, your Honor, Count 8—*

The Court: I know, I say it and read it.... I know of the inconsistency. There is no way to make an inquiry without tampering with their process.

*Do you have a way, Mr. Tuite?*

Mr. Tuite: *No.*

The Court: I can't say, "Let's verify your verdict." I can't say, "You made a mistake when I sent it back." I don't think it's proper to highlight those counts....

Mr. Mars: *I think we have to live with it. It's checked.*

The Court: I am open to suggestions. Of course, things can happen on the flip side.... *I don't know if that is going to be a reconsideration, them thinking that maybe they should reconsider it because I read them together. I have a real problem with that.*

Mr. Mars: *The signal they would get is that there is something wrong with*

*what they did and something needs to be changed.*

The Court: Exactly. I can't think of a way, Mr. Cutler, to do it. I appreciate the position. I assume you will say there is inconsistency, but I cannot do anything with the jury. I think it would be an invasive procedure, and I can't think of a way to do it retroactive.

Mr. Cutler: What I'm really left with is to make a post-verdict motion, so to speak, to the Court.

The Court: *Yes. I can't see any way not to highlight it. If I do it on DeLaurentis, then that highlights that count. And he's not the only one, because Infelise—*

Mr. Simone: *He's the only one found guilty of the Smith conspiracy.*

The Court: Right.

Mr. Simone: *I understand what you're saying. I mean, you know, just putting it out, I don't know.*

The Court: I appreciate the situation, but I can't see a way.

Mr. Simone: Are you going to do your regular poll, then? They must know now there is something with the verdict.

The Court: *I am going to do the regular poll because I cannot think of another way to do it that would not prejudice everybody.*

Mr. Cutler: *I can't either.*

\* \* \* \* \* \*

Mr. Cutler: *Are we going to do the forfeiture?*

The Court: *Tomorrow ....*

\* \* \* \* \* \*

(Tr. 6–11, March 10, 1992, 2:10 p.m.) (emphasis added). When this court concluded that any question posed would be perceived as questioning the deliberative process or the verdict, Mr. Cutler's request to question the jury was denied.

Immediately after the sidebar conference, the court polled each juror using the procedure approved by the Seventh Circuit.[5] The courtroom deputy clerk asked

**5.** Federal Rule of Criminal Procedure 31(d), in pertinent part, provides: "When a verdict is

each juror individually, *"Was this and is this now your verdict?"* Each juror answered *"yes."* After each juror was polled individually, the courtroom deputy then asked the jurors as a group, *"And so say you all, this is your verdict?"* All the jurors answered *"yes."*

The next day, Wednesday, March 11, 1992, the jurors returned to hear the forfeiture case against DeLaurentis and Infelise. The forfeiture case went to the jury after lunch and they returned their verdicts on that aspect of the case before the end of the day. The jurors were then polled individually and as a group on the forfeiture verdicts. Having returned verdicts on the final portion of the case, the jurors were dismissed.

Two days later, on Friday, March 13, 1992, Juror 25 appeared on the 5:00 p.m. news and stated that a mistake had been made with respect to DeLaurentis on Count 8. Juror 25 told a news reporter that the jury never voted on that count and that the verdict form was incorrectly marked guilty. During the 10:00 p.m. newscast that night, three more jurors indicated that a mistake had been made regarding Count 8 on DeLaurentis' verdict form. After hearing the newscast, the court, sua sponte, scheduled an in-chambers status hearing for Monday, March 16, 1992.

On March 16, 1992, counsel for the government and the defense met in chambers with the court, with a court reporter present, to determine what should be done regarding the allegations that a mistake had

been made in filling out Count 8 of DeLaurentis' verdict form.[6] Counsel for both sides agreed that the jurors should be questioned regarding this issue.[7] The court, with the input of counsel, devised a series of questions to ask the jurors. The court staff then attempted to schedule all of the jurors to come in the following day, Tuesday, March 17, 1992. Nine jurors were interviewed on that date and the three jurors who were unavailable on Tuesday were interviewed on Thursday, March 19, 1992.

When interviewing each juror, the court employed the following procedure. With three defense attorneys, two government attorneys, and a court reporter present, the court had each juror come to chambers and answer a series of questions. Each juror was questioned individually. The court stated: *"In the indictment, as it relates to Salvatore DeLaurentis, there were two charges relating to a conspiracy to murder Hal Smith—Racketeering Act 17(a) and Count 8."* The court then showed each juror a copy of Count 8 from the indictment. Next, the court stated: *"I am going to direct my questions only to Count 8. Regarding the verdict on Count 8 for defendant DeLaurentis which charged defendant DeLaurentis with the offense of conspiring to commit the murder of Hal Smith, the verdict form is checked guilty."* The court then asked: *"Did the jury vote guilty on that count?"* If the juror answered no, the court next asked: *"Did the jury reach a unanimous verdict regarding that count?"* If the

---

returned and before it is recorded the jury shall be polled at the request of any party or upon the court's own motion." As the Seventh Circuit stated in *United States v. Shepherd:*

> Rule 31(d), Fed.R.Crim.P., ... does not prescribe the manner in which [polling of a jury] is to be conducted. This is a matter left to the discretion of the trial judge. (Citations omitted). Section 5.5 of the *ABA Standards Relating to Trial by Jury* (Approved Draft, 1968) suggests that "the poll be conducted by the court or the clerk of court asking each juror individually whether the verdict announced is his verdict." We agree that this is the best practice.

576 F.2d 719, 722 n. 1 (7th Cir.), *cert. denied,* 439 U.S. 852, 99 S.Ct. 158, 58 L.Ed.2d 155 (1978).

**6.** All of the post trial proceedings and briefs relating to jury verdict issues have been placed under seal in order to protect the integrity of the deliberative process.

**7.** Mr. Kevin Milner, attorney for defendant Infelise and acting on behalf of defendants DeLaurentis and Bellavia, also wanted the jurors polled on verdicts involving other counts of the indictment and other defendants. The court denied this request because the court found no evidence indicating that the jurors believed that they had made a mistake on any count other than Count 8 as it applied to DeLaurentis.

juror answered yes, the court finally asked: *"What was that verdict?"* After completing the prepared questions and any related follow-up questions posed by counsel, the court instructed each juror not to discuss the court's questions, his or her answers, or anything about the case with anyone, including his or her family, friends, fellow jurors, and the media, until further notice from the court.

In response to the court's inquiries, three jurors stated that the guilty verdict on Count 8 was correct and that this vote had been unanimous.[8] Three jurors indicated that the verdict was not guilty and that this vote had been unanimous.[9] One juror explained that he voted guilty, but the jury's vote was not unanimous.[10] Finally, five jurors stated either that no vote on Count 8 was taken or that they could not recollect a vote being taken.[11]

Several months later, this court received a letter from Juror 25 dated August 28, 1992 ("Letter"). The bulk of the letter discussed Juror 25's confusion regarding the verdict against DeLaurentis on Count 8, as well as how and why she contacted the reporter and let him interview her about that verdict.[12] Juror 25 also commented on the activities and comments of jurors during their deliberations on the case, and made reference to comments made by prosecutor Mars during the March 16, 1992 in-chambers status call.[13] When this court resumed in session in early September 1992, this court reviewed the letter and immediately made it available, under seal, to the government and defense counsel.

### Defendants Infelise's and DeLaurentis' Motions to Interview Jurors

DeLaurentis and Infelise bring motions to interview jurors or for an evidentiary hearing to determine whether the jury was affected by outside influences in this case. DeLaurentis and Infelise base their claim on the comments in Juror 25's August 28, 1992 letter to this court.[14] In this letter, Juror 25 discussed events occurring during jury deliberations and comments made by prosecutor Mars during the March 16, 1992 in-chambers status call. Defendants contend that the letter sufficiently demonstrates that the jury in this case was affected by outside influences and therefore, a hearing is warranted to determine the scope of that influence.

■ To resolve this issue, the court begins with Federal Rule of Evidence 606(b) ("Rule 606(b)"), which provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

The Advisory Committee Notes pertaining to Rule 606(b) explain that "[t]he values sought to be promoted by [the rule] include freedom of deliberation, stability and finality of verdicts, and protection of jurors against annoyance and embarrassment." By making jurors incompetent to testify about *any matter* which occurred during

---

**8.** Jurors 24, 82, and 89.

**9.** Jurors 55, 60, and 90.

**10.** Juror 91.

**11.** Jurors 25, 37, 53, 54, and 87.

**12.** *See* Letter at ¶¶ 3–8.

**13.** *See* Letter at ¶¶ 10–12.

**14.** As explained in footnote 6, this letter, as well as all post trial proceedings and briefs relating to jury verdict issues have been placed under seal in order to protect the integrity of the deliberative process.

deliberations or the effect of virtually *anything* upon the juror's decision to vote a certain way, the rule seeks to discourage almost all inquiries into the jurors' deliberative process once a verdict is rendered. As the Fifth Circuit stated in *United States v. Dotson*, "[j]urors will not be able to function effectively if their deliberations are to be scrutinized in post-trial litigation. In the interest of protecting the jury system and the citizens who make it work, Rule 606 should not permit any inquiry into the internal deliberations of the jurors." 817 F.2d 1127, 1130 (5th Cir.1987) (quoting S.Rep. No. 1277, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 7051, 7060).

■ Courts are reluctant to "haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct, or extraneous influences." *United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir.1983), *cert. denied*, 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984). There is no per se rule requiring courts to investigate the internal workings of a jury when a defendant asserts jury misconduct. "The duty to investigate arises only when the party alleging misconduct makes an adequate showing of extrinsic influence to overcome the presumption of jury impartiality." *United States v. Barshov*, 733 F.2d 842, 851 (11th Cir.1984), *cert. denied*, 469 U.S. 1158, 105 S.Ct. 904, 83 L.Ed.2d 919 (1985) (citations omitted). Under Rule 606(b), a post trial hearing should only be held when a party comes forward with "clear, strong, substantial, and incontrovertible evidence ... that a specific, non-speculative impropriety has occurred[.]" *Moon*, 718 F.2d at 1234.

■ With the guidance of these cases, the court turns to the facts of this case. In her letter, Juror 25 commented on the manner, tone, and process of jurors arguing over the verdict.[15] While Juror 25 may have disapproved of what she alleged to have occurred, Rule 606(b) prohibits jurors from testifying about these matters. *See United States v. Ford*, 840 F.2d 460, 465 (7th Cir.1988); *United States v. Norton*, 867 F.2d 1354, 1366 (11th Cir.1989), *cert. denied*, 491 U.S. 907, 109 S.Ct. 3192, 105 L.Ed.2d 701 (1989). Therefore, holding a hearing on this basis is not necessary.

■ DeLaurentis and Infelise also contend that outside influences affected the jury because Juror 25 made statements in her letter regarding jurors' motives during deliberations.[16] Defendants speculate that alleged accusations in the jury room were inspired by a Chicago Tribune newspaper article.[17] This court agrees with the government that this is pure speculation. In her letter, Juror 25 does not refer to any newspaper articles, or anything else to suggest extraneous influences on the jury. Rather, Juror 25 only comments on intrajury influences on the verdict during the deliberative process. Testimony concerning intrajury influences is strictly prohibited. As Rule 606(b) provides:

> [a] juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or ... the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith ...

Clearly, investigating intrajury occurrences is inappropriate under Rule 606(b). *See Ford*, 840 F.2d at 465; *Norton*, 867 F.2d at 1366. Therefore, this court will not hold a hearing on this basis.[18]

---

**15.** *See* Letter at ¶ 10, lines 1–2.

**16.** *See* Letter at ¶ 10, lines 8–10.

**17.** *See* Defendant Infelise's Motion to Interview Jurors Regarding Extraneous Prejudicial Information, Exhibit A, *Under Seal*.

**18.** Even if there was evidence from Juror 25's letter or from a hearing that the newspaper article was read by the jury, a new trial would not be required. A new trial is only required when there is a "reasonable possibility" that the extraneous material affected the jury's verdict. *United States v. Sababu*, 891 F.2d 1308, 1333 (7th Cir.1989). Here, there is no evidence to suggest that outside influences affected the jury's verdict.

■ This court also rejects defendants' request for a hearing based on Juror 25's statements in her letter about prosecutor Mars' comments at the March 16, 1992 in-chambers status call.[19] Juror 25's statements regarding this proceeding have no bearing on whether jury deliberations were tainted by outside influences.[20] As the government suggests, Juror 25's statements regarding prosecutor Mars' comments refer to post verdict occurrences. Such occurrences have no bearing on the accuracy of the jury's verdict in this case. Since there is no other evidence to support defendants' speculation about the sanctity of the jury's verdict, this court finds that there is not sufficient evidence to hold a hearing.

Defendants argue that this case is similar to *United States v. Ianniello*, 866 F.2d 540 (2d Cir.1989), where the Second Circuit found that a hearing was warranted to determine if the deliberative process had been tainted by outside influences. In that case, the affidavits of three jurors were submitted to the court suggesting that the trial judge had admonished jurors to reach a verdict and not to be a hung jury. The affidavits also indicated that a federal marshal warned the jury foreperson that they would have to listen to over 100 tapes if they did not reach a decision. *Id.* at 542. The Second Circuit determined that these affidavits provided sufficient evidence of outside influences to warrant an evidentiary hearing. "Affidavits of three jurors alleging specific acts of inappropriate conduct by the district judge and a federal marshal responsible for the jury satisfy the standard set out above. The jurors' statements contain concrete allegations of inappropriate conduct that constitute competent and relevant evidence." *Ianniello*, 866 F.2d at 543.

Unlike *Ianniello*, Juror 25's letter does not contain any concrete allegations of out-side influences. The letter only comments on her views of jurors' behavior during deliberations. Under Rule 606(b), these allegations do not provide a basis for an evidentiary hearing. Therefore, defendants' motions to interview jurors are denied.

### *Defendant DeLaurentis' Motion to Vacate Count 8 and Enter Order of Mistrial*

In this motion, DeLaurentis contends that the jury's guilty verdict on Count 8 which charged him with conspiracy to murder Hal Smith for the purpose of maintaining his position in the Ferriola Street Crew is inconsistent with the jury's verdict that he was not guilty of Racketeering Act 17(a) which charged the same conspiracy. The charges in Racketeering Act 17(a) and Count 8 are as follows:

### *SEVENTEEN*

### *(The Murder of Hal Smith)*

*(a) From in or about early 1984 through the evening of February 7, 1985, near Chicago, Illinois, defendants Rocco Ernest Infelise, Louis Marino, Salvatore DeLaurentis, Robert Bellavia, and Robert Salerno, and others conspired to murder Hal Smith in violation of Illinois Revised Statutes, Chapter 38, Sections 8–2 and 9–1, and punishable by imprisonment for more than one year; and*

### *COUNT EIGHT*

*The SPECIAL SEPTEMBER 1987 GRAND JURY further charges:*
*1. That the facts as alleged in Count One of this indictment as regards the section entitled THE ENTERPRISE, are hereby realleged, adopted and incorporated by reference as though fully set forth herein.*

---

**19.** *See* Letter at ¶ 12, lines 2–4.

**20.** The only way that Juror 25 could have known about prosecutor Mars' comments was by seeing a transcript of or being told about the sealed proceedings. While no evidence has been produced suggesting who may be responsi-ble for the disclosure, all the parties are aware that this court's order to seal the proceedings was violated. A transcript of the proceedings was received by ABC News because the cover sheet and excerpts from the March 16, 1992 transcript were flashed during a news segment.

*2. That from in or about the fall of 1984 through the evening of February 7, 1985, within the Northern District of Illinois, Eastern Division,*

 *ROCCO ERNEST INFELISE,*
 *LOUIS MARINO,*
 *SALVATORE DELAURENTIS,*
 *ROBERT BELLAVIA, and*
 *ROBERT SALERNO,*

*defendants herein, knowingly and unlawfully did conspire, combine, confederate and agree with one another to kidnap and murder Hal Smith for the purpose of maintaining their position in the enterprise engaged in racketeering activity so described in Count One of this indictment as the Ferriola Street Crew and being in violation of Illinois Revised Statutes, Chapter 38, Sections 8–2 and 9–1.*

*All in violation of Title 18, United States Code, Section 1952B.*

Because the jury found DeLaurentis not guilty on Racketeering Act 17(a) and guilty on Count 8, DeLaurentis also argues that this court should have questioned the jury when the verdict was returned as his trial attorney requested. Finally, DeLaurentis contends that this court should vacate the jury's verdict against him on Count 8 and declare a mistrial. He concludes that a mistrial is appropriate because, through some mistake, the verdict announced was not the verdict on which agreement had been reached. He bases this argument on the verdict itself, the evidence presented at trial, and the results of the individual interviews the court had with the jurors in which nine of the twelve failed to confirm the accuracy of their guilty verdict on Count 8.

■ In making this argument, DeLaurentis relies on an exception to Rule 606(b) created by federal common law. Several courts have held that jurors are competent to testify that "through mistake, the real verdict on which agreement was reached in the jury room was not correctly expressed in open court. *Young v. United States,* 163 F.2d 187, 189 (10th Cir.), *cert. denied,* 332 U.S. 770, 68 S.Ct. 83, 92 L.Ed. 355 (1947); *see also McCullough v. Consolidated Rail Corp.,* 937 F.2d 1167, 1171 (6th Cir.1991); *United States v. Stauffer,* 922 F.2d 508, 513–14 (9th Cir.1990); *Dotson,* 817 F.2d at 1130; *Fox v. United States,* 417 F.2d 84, 89 (5th Cir.1969). Generally, courts have only vacated verdicts on this basis when the jury unanimously confirms that the verdict was communicated incorrectly. Only in this way have the few courts who have addressed this issue been assured that "all the jurors [agree] that through inadvertence, oversight, or mistake the verdict announced was not the verdict on which agreement had been reached." *McCullough,* 937 F.2d at 1170 (quoting Weinstein's Evidence § 606[04] at 606–40.

■ DeLaurentis first asserts that the jury's verdicts on Racketeering Act 17(a) and Count 8 were clearly inconsistent. Upon review of the verdict forms, this court and defense counsel immediately noticed that these verdicts appeared to be inconsistent on their face. While this court recognizes that verdicts cannot be set aside merely on the grounds that they are inconsistent, *United States v. Beck,* 615 F.2d 441, 448 (7th Cir.1980) (citing *Hamling v. United States,* 418 U.S. 87, 101, 94 S.Ct. 2887, 2899, 41 L.Ed.2d 590 (1974)), this court finds the inconsistency between the jury's verdicts on Racketeering Act 17(a) and Count 8 disturbing. Racketeering Act 17(a) and Count 8 depend upon substantially the same facts and the violation of the same law.[21] For either charge, a conviction

---

**21.** The elements of conspiracy to murder, as described in Jury Instruction 102, are:

 Under Illinois law, a person commits the crime of conspiracy to murder when he, with intent that the offense of murder be committed, agrees with another or others to the commission of the offense of murder, and an act in furtherance of the agreement is performed by any party to the agreement.

 An agreement may be implied from the conduct of the parties although they acted separately or by different means and did not come together or enter into an express agreement. The elements of Racketeering Act 17(a), as described in Jury Instruction 103, are:

 To prove that a defendant committed a racketeering act of conspiracy to murder under Illinois law as charged in Racketeering Act

depended upon a finding that DeLaurentis conspired with defendants Infelise, Marino, Bellavia, and Salerno with the intent to murder Hal Smith.

Defendants have not provided and this court has not found any cases where a jury rendered inconsistent verdicts on charges with virtually identical elements. A review of the law in this area has revealed that the Seventh Circuit has repeatedly upheld inconsistent verdicts where the underlying elements of the crimes are different.[22] This has often occurred when juries have found the defendant guilty of conspiracy, but not guilty of the underlying substantive offense.[23] For example, in *Brown*, 934 F.2d 886, the jury found the defendant guilty of conspiracy to possess cocaine with the intent to distribute, but not guilty of three counts of possession of cocaine with the intent to distribute. The court upheld the inconsistent verdicts, stating:

> In *United States v. Powell*, 469 U.S. 57 [105 S.Ct. 471, 83 L.Ed.2d 461] (1984), the Supreme Court stated that each count in an indictment is to be treated as a separate indictment and that an acquittal on one count does not dictate an acquittal on any other count. *Id.* at 62–63 [105 S.Ct. at 475–76] (citation omitted). The Court reasoned that, when a jury returns inconsistent verdicts, it may do so for reasons other than a determination of innocence,

such as mistake, compromise, or lenity. *Id.* at 65 [105 S.Ct. at 476]. The Court also noted that the government must bear the consequences of the jury's judgment because it cannot appeal an acquittal rendered by a jury. *Id.* at 66 [105 S.Ct. at 477]. Thus, the Court concluded that a defendant should not be afforded the further benefit of a presumption that inconsistent verdicts indicate a jury's determination that the defendant is innocent. *Id.* at 69 [105 S.Ct. at 479].

In cases like *Powell* and *Brown*, the courts recognized the importance of upholding juries' verdicts, even when these verdicts were inconsistent. This makes sense where juries rendered verdicts on different charges with different elements. However, the *Brown* rationale does not fit squarely with the facts in the instant case. Given that the charges in Count 8 and Racketeering Act 17(a) were virtually identical, it would be particularly odd for the jury in this case to intend these verdicts to be inconsistent. While courts may not be reluctant to let inconsistent verdicts stand when they are based on charges with different elements, this court is hesitant to apply the *Brown* court's rationale where the verdicts are based on charges with virtually identical elements.

---

17(a), the government must prove beyond a reasonable doubt the following elements:
First, that the defendant agreed with another or others to the commission of the offense of murder;
Second, that the defendant did so with intent to kill another; and
Third, that an act in furtherance of the agreement was performed by any party to the agreement.
Finally, the elements of conspiracy to murder in Count 8, as described, in pertinent part, in Jury Instruction 106, are:
To prove a defendant guilty of conspiring to commit murder as charged in Count 8, the government must prove beyond a reasonable doubt the following elements:
First, that the racketeering enterprise as alleged in count 1 existed. I have already instructed you as to the law on this element in instruction number 39;
Second, that the defendant you are considering was employed by or associated with the enterprise alleged in Count 1. I have already

instructed you as to the law on this element in instruction number 40;
Third, that the particular defendant conspired with one or more persons to commit the murder of Hal Smith in violation of Illinois law. I have already instructed you as to the Illinois law on conspiracy to murder in instructions numbered 102–03;
Fourth, that the particular defendant did so with a purpose of maintaining his position of that enterprise.

**22.** *See, e.g., United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984); *United States v. Brown,* 934 F.2d 886 (7th Cir.1991); *United States v. Paiz,* 905 F.2d 1014 (7th Cir. 1990); *United States v. Reed,* 875 F.2d 107 (7th Cir.1989); *United States v. Grier,* 866 F.2d 908 (7th Cir.1989); *United States v. Kasvin,* 757 F.2d 887 (7th Cir.1985); *United States v. Magnus,* 743 F.2d 517 (7th Cir.1984).

**23.** *See, e.g., Brown,* 934 F.2d 886; *Reed,* 875 F.2d 107; *Grier,* 866 F.2d 908; *Kasvin,* 757 F.2d 887; *Magnus,* 743 F.2d 517.

The evidence regarding the Smith murder demonstrates that the inconsistency of the jury's verdicts is particularly significant. At trial, the government sought to demonstrate that defendants Infelise, Bellavia, Salerno, and Marino were present and participated in Smith's murder at Jahoda's house in February 1985. However, the government did not produce any evidence suggesting that DeLaurentis was present or participated in the murder. Rather, the government attempted to prove DeLaurentis' involvement in the Smith murder by demonstrating that in February or early March 1984, almost one year before the murder, when DeLaurentis was attempting to collect street tax from Smith, DeLaurentis became angry and told Smith that he was "trunk music."

The government also referred to various tape recorded conversations between Jahoda and DeLaurentis following the murder. For example, on October 18, 1989, DeLaurentis and Jahoda discussed who the government had talked to and who had been subpoenaed about the Smith and Plummer homicides. Similarly, on October 21, 1989, Jahoda and DeLaurentis discussed the subpoenas they had received to give hair and blood samples to the grand jury investigating the Smith murder. They also discussed how they were going to fight the subpoenas and who else received them.

Although it could be inferred from this evidence that DeLaurentis had knowledge of the Smith murder and was concerned about it, there were no specific references to DeLaurentis' role or participation in the murder or conspiracy. *See United States v. Infelise*, No. 90 CR 87, 1991 WL 255630 (N.D.Ill. Oct. 28, 1991). For the purposes of determining whether DeLaurentis' guilty verdict on Count 8 was the correct and intended verdict, this evidence substantiates DeLaurentis' claim that the disputed verdict was incorrect without implicating the credibility of the jurors or attempting to impugn the deliberative process in violation of Rule 606. This is particularly true when one examines the substantial evidence against defendants Infelise, Bellavia, Salerno, and Marino on whom the jury could not reach a verdict. Jahoda testified in great detail about various conversations he had with these defendants before and on the evening of Smith's murder. Jahoda also specifically identified each defendant as being present on the night of and the role they played in Smith's murder. The government presented additional evidence to corroborate Jahoda's testimony.

In evaluating the validity of the verdict on Count 8, this court must also examine the verdict forms utilized in this case. The verdict forms employed in this case were more extensive than criminal verdict forms typically employed in this jurisdiction. Generally, juries receive three verdict forms for each defendant which require them to mark and sign one form if they find a defendant guilty of all the charges in the indictment, a second form if they find a defendant not guilty of all of the charges, and a third form in the event that there is a mixed verdict asking them to write in the count or counts of which they find a defendant guilty or not guilty.

In the instant case, the court provided the parties with more extensive verdict forms because of the potential for confusion with this case's multiple defendant and multiple count indictment. There was one separate verdict form for each defendant and each verdict form identified each count, including each racketeering act and unlawful debt charged under RICO, for that defendant. The racketeering acts and unlawful debts were defined in the verdict forms, but the substantive counts were only identified by their count number with no explanation of the count.[24] No one ever requested or suggested that an explanation of each count should be included in the verdict form. The verdict forms clearly identified by number each charge against each defendant, and only required the jurors to mark it "guilty" or "not guilty," or to leave it blank if no verdict could be

---

24. In hindsight, it may have been advantageous to spell out the substance of each count in the same manner that the racketeering acts and unlawful debts were spelled out for Count 1. However, neither the government nor defense counsel made this suggestion at any time.

reached. For example, DeLaurentis' verdict form, in pertinent part, read:

I. *We, the jury, find defendant SAL-VATORE DELAURENTIS:*

_____ *guilty*

_____ *not guilty*

*as charged in Count One.*

II. *If you conclude that defendant SALVATORE DELAURENTIS is guilty as charged in Count One, complete the following:*

*17(a). In making our finding, we find defendant SALVATORE DELAUREN-TIS* _____ *agreed,* _____ *did not agree to the Conspiracy to Murder Hal Smith as alleged in Racketeering Act 17(a).*

With respect to Count 8, DeLaurentis' verdict form read:

### Count 8

*We, the jury, find defendant SALVA-TORE DELAURENTIS*

_____ *guilty*

_____ *not guilty*

This court has never experienced any problems with verdict forms. Unfortunately, in this rare instance, the more extensive verdict forms did not prevent an apparent inconsistency. Now that doubts about the accuracy of the verdict on Count 8 have arisen, DeLaurentis argues that the court's decision not to question the jury regarding this discrepancy on the day it was discovered is grounds for a mistrial.

To resolve this issue, the court turns to the suggestions made by counsel at the sidebar conference. When this issue arose, the court recognized that framing any potential question properly was crucial in this case. Other than his suggestions that the court ask, *"Now, as to Count 8, which is the conspiracy to murder Al [sic] Smith, we have guilty. Is that your vote?"* and *"I can see you found 17(a) not agreed and guilty on Count 8 regarding conspiracy, regarding the murder of Al [sic] Smith, is that your verdict?"* (Tr. 6–8, March 10, 1992, 2:10 p.m.), Mr. Cutler had no other ideas. Mr. Tuite, defendant Infelise's attorney, did not offer any suggestions for a

proper question. AUSA Mars and Mr. Simone, defendant Bellavia's attorney, objected to any inquiry of the jury. All the proposed questions considered by the court at the sidebar had the potential of suggesting to the jury that there was an error regarding the verdict.[25] Questioning the jury also ran the risk of raising questions about the jury's inability to reach a verdict against the other defendants on that count.

In addition, the court and counsel were well aware that the verdict in this case would receive significant media attention and the jury was to return the next day to hear the forfeiture case against defendants Infelise and DeLaurentis. It was particularly important not to second guess the jury's verdict when they would be deliberating on another verdict in the case on the next day. It is difficult to predict what impact questioning the jurors regarding their verdict on Count 8 could have had on their deliberations on the forfeiture case.

Furthermore, the potential questions considered by the court and counsel at the sidebar conference could also have been interpreted by the jury as pressure to reach a verdict. After a 4½ month trial and deliberating for approximately one week, the jury wrote a note indicating that they were hung on various counts, and were read the *Silvern* instruction a second time. Twenty minutes after reading *Silvern,* the jury wrote a second note saying they were deadlocked and could not reach a verdict with respect to certain counts. The jury was then brought into open court and each juror was questioned individually on whether a verdict could be reached with further deliberations. They all answered that further deliberations would not be helpful. Given all of these circumstances, the jury's verdict was clearly a very sensitive issue and even a neutral sounding question could have been suggestive.

■ However, DeLaurentis argues that where there is the appearance of any uncertainty or contingency in a jury's verdict, as here, "it is the duty of the trial judge to resolve that doubt." *United States v. Mor-*

---

**25.** *See* This opinion at 601–02 and Tr. 6–11, March 10, 1992, 2:10 p.m.

*ris,* 612 F.2d 483, 489 (10th Cir.1979). The *Morris* court further explained:

> Whereupon a poll one or more jurors express some uncertainty as to the verdict, the trial judge is vested with discretion under F.R.Crim.P. 31(d), to direct the jury to retire for further deliberations or to discharge the jury. (Citation omitted). Although not expressly so stated in the rule, the power to repoll the jury is also among the judge's discretionary powers. This power is most helpful where, for instance, the jury has been confused by multiple parties or counts. (Citations omitted).

*Id.* Unlike *Morris* where, when polled, the foreman stated that the verdict read by the court was not his verdict, in this case, no juror expressed any uncertainty regarding the verdict when polled. The only indication that there may have been a problem with the verdict was the fact that the verdicts for Racketeering Act 17(a) and Count 8 were inconsistent. However, as previously noted, consistent verdicts are not required. *See United States v. Beck,* 615 F.2d at 448 (citing *Hamling,* 418 U.S. at 101, 94 S.Ct. at 2899). Since no juror indicated during the polling that an error had been made with respect to the verdicts, polling the jury was not necessary under *Morris.* As explained in *Morris,* the question of repolling the jury was a matter for the court's discretion. 612 F.2d at 489. Given all the circumstances of this case, this court's decision not to repoll the jury on the date of the verdict was reasonable.

 Finally, the court turns to the jurors' responses during the limited voir dire on March 17 and 19, 1992. Under Rule 606(b), juror interviews can be conducted to resolve doubts regarding the accuracy of the verdict announced, but not to question the process by which the verdict was reached. *McCullough,* 937 F.2d at 1171. This court, being acutely aware of Rule 606(b)'s mandate and the importance of not infringing upon the deliberative process, exercised care in conducting the limited voir dire.

In *Attridge v. Cencorp Division of Dover Technologies Int'l, Inc.,* 836 F.2d 113, 117 (2d Cir.1987), the Second Circuit explained that the permissibility of juror testimony regarding the accuracy of a verdict depends upon the purpose for which it was offered. The court approved the voir dire of a jury regarding the accuracy of their verdict because the judge's inquiry was "designed to ascertain what the jury decided and not why they did so." *Id.* In that case, the judge limited his inquiry to one question: "What was your understanding as to what the verdict was; what was the jury verdict?" The Second Circuit concluded that such interviews were appropriate because "[they] were intended to resolve doubts regarding the accuracy of the verdict announced, and not to question the process by which those verdicts were reached." *Id.*

The Seventh Circuit, in *Haugh v. Jones & Laughlin Steel Corp.,* 949 F.2d 914 (7th Cir.1991), has also approved limited inquiries into the effect of extraneous influences on a jury's verdict. In *Haugh,* a federal marshal allegedly warned certain jurors that there was no such thing as a hung jury and they would be kept in custody for as long as it took them to reach a verdict. After the jury rendered a verdict, the foreman wrote a letter to the court regarding the marshal's actions. In response, the trial court held a hearing where each juror and the marshal were questioned. *Id.* at 916. In reviewing the appropriateness of the court's questioning, the Seventh Circuit stated:

> Rule 606(b) of the evidence rules, far from giving a judge carte blanche in questioning a jury about its verdict, forbids him to inquire into the jurors' beliefs, opinions, discussions, grounds, etc. save as necessary to determine the existence and content of any unauthorized communication made to the jury. The proper procedure therefore is for the judge to limit the questions asked the jurors to whether the communication was made and what it contained, and then, having determined that the communication took place and what exactly it said, to determine—without asking the jurors anything further and emphatically without asking them what role the communi-

cation played in their thoughts or discussion—whether there is a reasonable possibility that the communication altered their verdict.

*Id.* at 917; *see United States v. Fozo,* 904 F.2d 1166, 1171 (7th Cir.1990); *United States v. Schwartz,* 787 F.2d 257, 261 (7th Cir.1986).

 Keeping *Attridge* and *Haugh* in mind, it is clear that the procedures followed by this court did not intrude into jurors' beliefs, opinions, and discussions. This court, with the agreement of counsel, only asked the jurors if they voted guilty on Count 8 and if they answered no, this court asked if the jury reached a unanimous verdict regarding that count. If the jurors answered yes, the court asked what was that verdict. Since this court limited its questions to only obtain information necessary to verify the accuracy of the jury's verdict against DeLaurentis on Count 8, the questioning conducted by this court fell within the confines of Rule 606(b).

Based upon this court's limited inquiry, the following responses were elicited: (1) three jurors stated that the guilty verdict on Count 8 was correct and that this vote had been unanimous, (2) three jurors indicated that the verdict was not guilty and that this vote had been unanimous, (3) one juror explained that he voted guilty, but the jury's vote was not unanimous, and (4) five jurors stated either that no vote on Count 8 was taken or that could not recollect a vote being taken. In sum, 9 of the 12 jurors indicated that some error was made in rendering their verdict.

This court recognizes that the sparse case law addressing the application of Rule 606(b) suggests that a verdict can only be vacated if the jury unanimously indicates that an error was made in rendering its verdict. This court's decision would have been much simpler had all 12 jurors agreed on what the verdict was on Count 8. *See McCullough,* 937 F.2d at 1171. However, a close look at the facts presented here persuades this court that unanimous agreement is not required in this case.

The jurors in this case were questioned two weeks after deliberations began and 8–10 days after the original verdict was returned. They did not have the benefit of reviewing any notes they took during the 4½ month trial to refresh their recollection. They did not have all of the trial transcripts, exhibits, or jury instructions which were in the jury room during their deliberations. Finally, they did not have any notes they may have taken during deliberations. Therefore, it is not surprising that a few jurors had trouble recalling the exact results of their deliberations or that there were different recollections of their decision on Count 8. The fact that nine jurors, or ¾ of the jurors, said that some error was made and three said there was no error merely highlights the problems of inquiring into the accuracy of a verdict and trying to recreate the deliberative process in a multiple defendant and multiple count indictment. To hold that a unanimous determination by the jury that an error was made is required to vacate a verdict is not warranted given all of the facts considered here.

 After an examination of the three factors discussed above, this court is convinced that an error was made with respect to the jury's verdict against DeLaurentis on Count 8. Not only was the verdict inconsistent with the jury's verdict against DeLaurentis on Racketeering Act 17(a), but it was inconsistent with the jury's inability to reach a verdict on Count 8 with respect to defendants Infelise, Marino, Bellavia, and Salerno. And the majority of the jurors consistently stated that an error was made on DeLaurentis' verdict form. In light of this evidence, this court finds that the verdict published in open court on March 10, 1992 was not the "true verdict or no verdict was reached at all." *See Young,* 163 F.2d at 189.

Furthermore, this decision does not violate the language or the intent of Rule 606(b) since this court confined its inquiry to avoid intruding upon the thought processes of the jury.[26] This court did not

---

**26.** Indeed, as explained in footnote 6, this court

also had all post trial proceedings and briefs

elicit any responses during the course of the limited voir dire which would jeopardize the integrity of the deliberation process. Moreover, since this ruling is confined to the specific facts of this case, this court is confident that this decision in no way opens the door for this kind of inquiry in routine cases. The circumstances surrounding this case are highly unusual given the particularly complex nature of the charges in this multiple count trial of five defendants. This court strongly believes that such an extreme measure as vacating a verdict should not be considered under anything but unusual circumstances. To apply this court's ruling to anything but the most extreme examples would surely and wrongfully threaten the deliberative process.

Finally, for similar reasons, this court's ruling in no way threatens the integrity of the rest of the verdicts against DeLaurentis or the other defendants in this case since it is confined to Count 8 as it applies to DeLaurentis. Significantly, when questioned by the court regarding their verdict with respect to Count 8, no juror gave any indication that there was a problem with any other charge against any defendant in this case. The jurors consistently indicated that the only error made was with respect to the verdict rendered on Count 8. This point is important for two reasons. First, on several occasions during the trial, the jurors spoke candidly with the court on the record in-chambers. Generally, these sessions were prompted by jurors sending notes to the court regarding individual problems they were experiencing. Jurors also spoke openly with the court on the few occasions when this court was required to conduct limited voir dires on the record in-chambers regarding sensitive jury issues. This court is confident from the jurors' responses on those earlier occasions that they felt comfortable with the process used by the court and that the questions were answered in an honest and open manner.

Second, although the court made every effort to limit the voir dire regarding Count 8, when individually questioned about their verdict on this count, various jurors attempted to and did volunteer additional information regarding their deliberations. However, none of the jurors, including Juror 25, suggested that an error had been made with respect to the verdict on any other count. The court is confident that any other problems regarding deliberations or the verdicts would have been raised in that session.

### Conclusion

For the reasons stated above, this court denies Infelise's motion to interview jurors and DeLaurentis' post trial motion regarding juror written communication. This court grants DeLaurentis' motion to vacate the guilty verdict against him on Count 8 and declare a mistrial.

---

relating to jury verdict issues filed under seal to avoid intruding upon the thought processes of the jury and to protect the deliberative process from unwarranted scrutiny.