**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Claudia A. FORD, Defendant–Appellant.**

**No. 85–3161.**

United States Court of Appeals,
Seventh Circuit.

Argued May 28, 1987.
Decided Feb. 12, 1988.

Raymond D. Pijon, Chicago, Ill., for defendant-appellant.

Stephen Crocker, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, CUDAHY, and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

Defendant-appellant Claudia Ford appeals her conviction for conspiring with Gregory Little to rob a federally insured savings and loan. Ford was also convicted for using two firearms in the commission of the robbery, and for taking $19,000 from the savings and loan by force and intimidation while assaulting and jeopardizing the lives of the employees. We affirm.

I.

In 1985, Claudia Ford was the manager of the Lake Street branch of Great American Federal Savings and Loan Association ("Great American"), a federally insured savings and loan located at 230 North Michigan Avenue in Chicago. This branch utilized six cash drawers for tellers, two of which were "work fund drawers."[1] Each drawer had a number, and Ford was assigned drawer 501, a work fund drawer, in June of 1985.

At the end of every day, each employee assigned a drawer counts the exact amount of money in his respective drawer and enters the result on a tally sheet. This number is then compared with the teller's daily transaction printouts to assure that the final counts were the same for that day. The only available method for the bank to verify the accuracy of the physical count was to audit the drawer contents.

The bank had a policy of auditing an employee's drawer before the employee left on vacation. Ford was scheduled for

---

1. "Work fund drawers" contained extra cash for the branch manager or supervisor to distribute to tellers as needed throughout the day.

an audit on June 14, 1985 as she was leaving on vacation that day. The day before the scheduled audit, Ford closed out her blotter for drawer 501 by stating that it contained $60,653.73 in cash. According to Gregory Little, Ford called him that day and asked him if he wanted to make some big money fast. Ford was having an extramarital affair with Little, a college student, and she picked up most of their expenses and had authorized Little to use her credit cards.

Ford called Little later that afternoon and again that evening to tell him that she had devised a scheme to rob her bank. They agreed to meet for breakfast the following morning. Little came to the breakfast meeting on June 14 with a .9 millimeter gun. Ford presented her plan: she would enter the bank and signal to Little if the coast was clear, then let him into the bank. Ford instructed Little to knock out the bank guard to add some authenticity to the robbery. Ford left first for the bank. Little stopped to buy some vacuum-cleaner bags to put the money in and took a bus to Great American Savings and Loan.

Ford arrived at Great American first. When Little arrived, Ford gave him a "thumbs-up" signal, so he entered the bank and went with Ford to a back lunchroom-storage area. Ford produced a bag from which she pulled nylon hose and a .38 caliber revolver. Little was to put one nylon stocking over his head, use the others to tie up the guard and Ford, and use the gun to hit the guard. Ford went out to the tellers' area to unlock the cash drawers, taking with her the bags Little had brought. She returned to the back room five minutes later, but left upon noting that the guard had arrived.

By this time, at about 7:45 a.m., a teller had also arrived, and the teller and the guard were waiting in the building lobby outside the bank entrance. Ford had relocked the door, so the guard began looking for his keys. Ford eventually came to let them in, relocking the door behind them. The guard went to his desk and the teller headed toward the back room. Ford physically blocked the teller with her body from entering the back room. At this time, the teller returned to the tellers' area.

Ford called softly to the guard and accompanied him to the back room with her hand placed on his shoulder. Ford directed the guard into Little's grasp, and Little struck the guard with his gun, dropping the guard to his knees. Little struck the guard several more times, despite Ford's protesting not to kill him.

The teller took cover under the tellers' counter. Ford came out into the lobby area and circled it, while saying in a lowered voice, "help, we're being robbed." She returned to the doorway of the back room, and the teller overheard Little tell Ford, "Claudia, calm down." Ford went to the tellers' area and began tossing money into a pile on the floor. She filled two bags with money from this pile, but one of the bags ripped when Little picked it up. Ford took the teller's purse and instructed Little to fill it with money. Little departed with the purse and bag, leaving the remaining money in the pile on the floor.

Dawn Ritrovato, the branch's management trainee, heard the bank guard calling for help from inside the bank as she entered the building lobby. Ritrovato alerted the lobby guard and attempted to enter the bank. Ford met her at the bank's lobby door, told her they were being robbed, and pressed the holdup alarm. Ritrovato thought she recognized Little as she saw him exit through a side entryway because she had previously seen Little call upon Ford at the bank.

The police arrived and began an investigation at the scene. As they took statements, bank employees began auditing the drawers. All of the cash from the floor was placed in Ford's drawer, number 501, and the drawer was found to contain $18,537.73.

Meanwhile, Little returned to the place where he had left his car, and he locked his .9 millimeter gun and the money in the trunk. He returned later to take the gun and the money back to his house where he counted the money and discerned that he had taken between $19,000 and $19,500. Little went out to buy some drugs and

returned home to find FBI agents waiting for him. The agents found Little in possession of $19,315. Three days later, the FBI agents returned to the bank and discovered a packet of $5,000 in currency under the teller station and the .38 revolver Little had used in the robbery hidden under a newspaper.

When Ford was initially questioned by police, she told them that when she arrived at the bank she heard a voice from the back room say, "We know who you are and we have your staff," and that when she went back to the storage room she was confronted by two robbers. Later that afternoon she gave a statement to the police admitting that she had been involved in the bank robbery with Little and a third person and that they had planned it for three weeks. In the evening Ford told the FBI agents that Little had coerced her into robbing the bank when she tried to end their affair. Ford claimed that Little threatened to expose their relationship to her husband unless she allowed Little to rob the bank. She asserted that on the morning of the robbery, she let Little and another man into the bank before the teller and the guard arrived.

At trial, Ford testified that the robbery scheme was entirely Little's idea. According to Ford, Little contacted her on June 13, 1985 and insisted that they meet for breakfast, not telling her why. Ford said that she met Little for breakfast and left after ten minutes without learning what Little wanted, except that he asked her for $5,000. Ford claimed that Little followed her to the bank and implored her to speak with him. She testified that she let him in, and while her back was turned he was joined by another man. Ford stated that Little and his accomplice put stockings over their heads, and Little placed a gun to her head and ordered her to open the tellers' drawers.

Ford testified that when the guard and the teller arrived, Little ordered her to let them in, but not to alert the guard or the teller or he would kill them all. According to Ford, Little told her to bring the guard back to where Little was hiding after the guard and the teller were in the bank. She stated that as Little gathered the money, one of his bags broke, and she offered him the teller's purse as a substitute to speed his departure from the bank. When Ritrovato arrived, Ford alerted her to the robbery as the two robbers fled. Ford explained that when the police arrived, she did not identify Little to the police because she had "mixed emotions and [she] didn't want to be involved." During testimony about her financial plight, Ford acknowledged that she owed about $10,000 in charges on her credit cards and that $2,000 of that amount had been charged by Little. She also admitted that she paid $1,200 each month on her credit cards out of a monthly net income of $1,400.

On the day before trial, the government moved *in limine* for permission under Federal Rule of Evidence 404(b)[2] to present evidence and argue to the jury that Ford had embezzled money from cash drawer 501 at Great American prior to the June 14, 1985 robbery. The government sought to prove the embezzlement to establish Ford's motive for arranging the robbery: namely, to prevent the discovery of a cash shortage in her drawer at her audit time. The court deferred ruling on this motion; at the close of the government's case, the judge held that the government had not demonstrated by clear and convincing evidence that Ford had embezzled money from the bank, and that therefore the government could not make this argument to the jury. Because the court had previously prohibited any mention of embezzlement in opening statements, the jury never heard the word "embezzle" throughout the course of the trial, and the government did not argue that Ford had taken money from her cash draw-

2. Rule 404(b) provides:
"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

er. Neither side referred to any audit evidence or any figures in closing arguments.

The jury did hear evidence of auditing procedures used by the bank, including the following facts: that Ford was scheduled for an audit on June 14, 1985; that Ford had closed out her drawer on June 13, 1985 by stating that it contained $60,653.73; that after the robbery Ford's drawer had $18,537.73 in it; and that when Little was caught he had $19,315 with him. Although Ford objected to the admission of this evidence, the court held that it was directly relevant to the question of the robbery itself, in that it tended to prove that money had indeed been robbed from the bank on June 14, 1985.

The jury found Ford guilty of conspiring with Little to rob the bank (Count I), of taking $19,000 from the savings and loan by force and intimidation while assaulting and jeopardizing the lives of the employees (Count II), and of using firearms while committing the robbery (Count III). The court sentenced Ford to five years of imprisonment on both Counts I and III, to be served consecutively to each other. The court sentenced Ford to ten years of imprisonment on Count II, then suspended imprisonment on Count II and imposed a five year probation term consecutive to the incarceration ordered on Counts I and III.

## II.

Ford submits that the district court erred in refusing to strike the testimony concerning Ford's impending audit on the day of the robbery once it ruled that the government had failed to produce clear and convincing evidence that Ford had embezzled any money from her cash drawer. According to Ford, evidence of the $20,000 deficiency in the cash drawer and the impending audit was, at best, cumulative evidence of the undisputed fact that there was a robbery. Ford argues that the prejudice of the implication that she was an embezzler with a motive to set up the robbery far outweighed the probative value of establishing the amount of money not recovered, and thus she should be granted a new trial.

In reviewing the admissibility of this evidence, we note that "[t]he trial judge, who saw and heard the evidence firsthand, can best balance probity and prejudice, and the reviewing court may reverse only upon a showing of an abuse of discretion." *United States v. Brown*, 688 F.2d 1112, 1117 (7th Cir.1982). As this court stated in *United States v. Jordan*, 722 F.2d 353 (7th Cir.1983):

"When balancing prejudice and probative value, the courts of the various circuits have found the scale tipped in favor of admitting evidence of prior bad acts in cases where the acts involved, or explained, the circumstances of the crime charged, where the acts provided the background for, or development of, the crime charged, and where the acts completed the story of the crime on trial."

*Id.* at 356 (citations omitted). Moreover, where the prosecutor's references to such evidence were vague and indirect and the references supplied the background and surrounding circumstances of the crime charged, the testimony is not more prejudicial than probative and is thus admissible. *Id.* at 356–57. *See also United States v. Hattaway*, 740 F.2d 1419, 1424–25 (7th Cir.), *cert. denied*, 469 U.S. 1028, 105 S.Ct. 448, 83 L.Ed.2d 373 (1984).

■ We agree with the government that the district court did not abuse its discretion in refusing to strike the testimony concerning the audits. The audits were part of the chronology of events that occurred on the day of the robbery. As the government states, excluding this evidence would have left a "chronological and conceptual void" in the account of the events surrounding the robbery. *See id.* at 1425. Moreover, the audit evidence was not irrelevant or cumulative because the results of the audits corroborated Little's testimony that he had indeed taken money from the bank and demonstrated the true extent of the bank's loss.

■ Furthermore, we find that the risk of unfair prejudice from the audit evidence did not substantially outweigh its probative value. The jury never heard the word "embezzle" throughout the course of the trial, and the government never argued that Ford had taken money from her cash drawer; thus, the jury could draw whatever

inference it wished from the audit evidence. The jury could well have decided that one of the audits, either before or after the robbery, was in error. It might have surmised that Little had taken over $37,000 (the difference between what Ford reported in the drawer the day before the robbery and what was left after the robbery) and that he hid over $17,000 of this amount before he was caught with $19,315. The jury could have concluded that Little's alleged male partner had the rest of the money, that someone at the crime scene managed to spirit away some $17,000 from the cash pile, or that Ford herself had taken the money. Because the district court prohibited the government from using the word "embezzle" during the trial, all of the audit evidence was facially neutral, and the district court did not abuse its discretion in not striking the testimony and allowing the jury to draw whatever inference it wished about where the money went.

## III.

Eleven days after the conclusion of Ford's trial, the district court received a letter from one of the jurors in which that juror claimed that "many discrepancies and acts of improper behavior occurred by other jurors and specifically the jury foreman." The juror alleged that during deliberations, votes had been taken before all of the jurors had reviewed all of the evidence, that votes were cast verbally, and that there was "extreme and excessive pressure on individuals to change votes." Ford complains on appeal that the district court erred in not holding a hearing to determine whether there were improper influences on the jury during deliberations.

Federal Rule of Evidence 606(b) provides:

"Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror."

As this Court has explained, the Rule is designed not only to protect the jurors from being pestered by lawyers after verdicts are rendered, but also to protect the judicial process from efforts to undermine verdicts by scrutinizing the jurors' thoughts and deliberations. *United States v. Schwartz*, 787 F.2d 257, 261–62 (7th Cir. 1986). Thus, a court will not inquire into the jury's deliberative process, including arguments, statements, discussions, mental and emotional reactions, and votes, in the absence of a claim of external influence. *United States v. Sblendorio*, 830 F.2d 1382, 1389 (7th Cir.1987); *Wiedemann v. Galiano*, 722 F.2d 335, 337 (7th Cir.1983).[3]

■ In this case, the complaining juror did not refer in his letter to any outside influences on the jury, and there were no allegations that any extraneous prejudicial information was brought to the jury's attention nor that any outside influence was brought to bear on any juror. Instead, the allegations of the juror involve only intrajury influences on the verdict during the deliberative process. While the juror may have disapproved of what he alleges to have occurred, Rule 606(b) would prohibit the juror from testifying as to these matters. Thus, the complaining juror's allegations cannot be used by Ford to impeach

---

**3.** In *Attridge v. Cencorp Division of Dover Technologies International*, 836 F.2d 113 (2d Cir. 1987), the court recognized that Rule 606(b) does not extend to juror testimony on the veracity of a verdict and that juror testimony is admissible to establish that the verdict delivered was not the result actually agreed upon by the jury. The court noted that the permissibility of juror testimony hinges upon the purpose for which it is offered; where the court seeks to correct the mistaken transmission of the verdict from the jury, evidence may be received.

We express no opinion on whether this Circuit would follow the Second Circuit's reasoning in *Attridge*. We simply note that the case before us does not involve any allegations that the verdict delivered to the court was not the same as the one reached by the jury. Thus, we need not decide whether Rule 606(b) would prohibit such testimony.

the guilty verdict, and the district court was not required to hold a hearing on the issue. *See United States v. Kimberlin,* 805 F.2d 210, 244 (7th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 3270, 97 L.Ed.2d 768 (1987).

## IV.

Ford submits that the district court abused its discretion in imposing two consecutive five-year prison sentences on her. The jury found Ford guilty of armed bank robbery, in violation of 18 U.S.C. § 2113(a) and (d), using a firearm in a crime of violence, contrary to 18 U.S.C. § 924(c), and conspiracy, in contravention of 18 U.S.C. § 371. Section 924(c) provides that whoever uses a firearm in a crime of violence shall be sentenced to imprisonment for five years, and that this sentence must be consecutive to any other sentence and cannot be suspended. On December 3, 1985, the district court sentenced Ford to five years for the conspiracy count, then imposed the mandatory consecutive term of five years as required by section 924(c). The court also imposed a ten year sentence on the armed bank robbery count, then suspended imprisonment on this count and imposed a five year probation term consecutive to the incarceration ordered on the two consecutive five-year terms.

"A sentence which is within the limits established by statute under which it is imposed will not be vacated upon review unless the sentencing judge relied upon improper considerations or unreliable information in exercising his discretion or failed to exercise any discretion at all in imposing the sentence." *United States v. Harris,* 761 F.2d 394, 402–03 (7th Cir.1985). Ford's consecutive five-year sentences and five-year consecutive probation term fall within the applicable statutory limit of twenty-five years for armed bank robbery under 18 U.S.C. § 2113(d), five years for conspiracy under 18 U.S.C. § 371, and mandatory five consecutive years for using a firearm in a crime of violence under 18 U.S.C. § 924(c). Therefore, our review is limited to whether the trial judge based the sentence on improper considerations or failed to exercise any discretion in imposing the sentence. *Harris,* 761 F.2d at 403.

Ford alleges that the district court improperly considered her perceived lack of candor on the witness stand and her failure after her conviction to admit guilt and show remorse. A review of the record in the present case reveals that the trial judge, in explaining her intent in sentencing Ford, stated:

"One of the reasons that the job I have right now is even more difficult is because of the fact that this Court saw all the evidence in this case, saw the repeated times that Miss Ford lied on the record, had an opportunity to review the presentence report in which Miss Ford shows no remorse nor any acknowledgement of the crime that was committed nor any involvement in it. And in this Court's view, one of the first steps toward rehabilitation is an admission that you are involved in the crime, some admission in some form, shape, or fashion. I must tell you that that troubles me very much.

I am aware of the fact that Miss Ford had a clean record, was not involved with any kind of wrongdoing, was not convicted of any crimes previously and had a sterling record. And, of course, those are factors that I have to take into account when I sentence her. But what has troubled me—and I received a letter from Miss Ford where she outlined her background, her history, her work history of how she struggled to achieve the position as manager of Great American Federal Savings, a position that was one of trust in which her co-workers—she was seen as a leader by her co-workers. She was there to provide an example, and I think through the testimony at the trial, what she did with that trust.

I don't think it would be appropriate to sentence her to the same amount of time as Mr. Little, although similarly situated in that he had no prior criminal record; rather, readmit [sic] his involvement and guilt and indeed cooperated with the government and testified during the course of the trial.

As I indicated, I think for rehabilitation, first, there has to be a step in the direction of admitting that you did some-

thing wrong. I have not seen that on behalf of Mrs. Ford, not in the letter she drafted, nor in the statements that she made to the probation officer, and I think that is very serious indeed. And for that reason I am going to sentence her to additional incarceration, understanding with respect to Count III that the Court must sentence her to five years in the custody of the Attorney General.

With respect to Count I, the Court sentences her to an additional five years to run consecutive to Count III....

With respect to Count II, ten years in the custody of the Attorney General, that sentence to be suspended and she to be [sic] placed on five-years probation, that sentence to be consecutive to the sentence in Count I."

Sentencing Tr. 2–4.

■ A defendant's truthfulness while testifying is indicative of his attitudes toward society and his prospects for rehabilitation. *United States v. Grayson*, 438 U.S. 41, 52, 98 S.Ct. 2610, 2616, 57 L.Ed.2d 582 (1978). Thus, a trial judge may consider this factor in determining the sentence to be imposed and may enhance a defendant's sentence if the judge believes that the defendant testified falsely. *Id.* at 55, 98 S.Ct. at 2618. *See also United States v. Lovett*, 811 F.2d 979, 989 (7th Cir.1987). Moreover, this Circuit has held that in determining the appropriate sentence for a defendant, one relevant factor for the district court to consider is the defendant's refusal to recognize his offense. *United States v. Marquardt*, 786 F.2d 771, 782

(7th Cir.1986). Therefore, the trial judge did not err in considering the truthfulness of Ford's testimony or Ford's refusal to recognize her offense at the sentencing hearing.[4]

### V.

The decision of the district court is AFFIRMED.

---

**4.** Ford contends that the district court improperly attempted to provoke a public confession from her in return for a reduction in her sentence. After the trial judge had sentenced Ford, the judge stated:

"Let me also say that if at some point when you have all that time to reflect, Mrs. Ford, and when you think about what your obligations are, you have a change of heart in terms of admitting your involvement in this case, that the Court would certainly review the sentence that I have imposed today. But as the record stands now, I think you have made the choice a difficult one for me."

As the First Circuit recognized in *United States v. Miller*, 589 F.2d 1117, 1138 (1st Cir. 1978), *cert. denied*, 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979), it is difficult in some cases to distinguish between punishment for

failure to confess and evaluation of a defendant's character by truthfulness while testifying and refusal to recognize his offense. In this case, the district court articulated several reasons for enhancing her sentence, including the untruthfulness of her story, her abuse of trust, and her refusal to recognize her offense. While the district court may have committed error (as alleged by the defendant) if in fact it offered to reduce the sentence in exchange for a confession, any error was harmless because the comment referred to was made after the sentence was imposed. Moreover, because the district court articulated additional reasons for increasing the sentence, we are convinced that the trial judge's sentencing decision was not tainted by any conceivably impermissible considerations. *See, e.g., id.* at 1139.