2010 ME 118

**STATE of Maine**

v.

**Ryan A. HURD.**

Supreme Judicial Court of Maine.

Argued:  June 16, 2010.
Decided:  Nov. 16, 2010.

Richard L. Hartley, Esq. (orally), Law Office of Richard L. Hartley, Bangor, ME, for Ryan Hurd.

James A. Andrews (orally), Assistant District Attorney, Franklin County District Attorney's Office, Farmington, ME, for the State of Maine.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

Majority: SAUFLEY, C.J., and ALEXANDER, LEVY, MEAD, and GORMAN, JJ.

Dissent: SILVER, and JABAR, JJ.

ALEXANDER, J.

[¶ 1] This appeal asks us to consider M.R. Evid. 606(b) and our prior precedents holding that, to protect the integrity of the jury deliberation and verdict announcement process, a trial court, once it has taken a verdict and discharged a jury, may not reconvene the jury, permit the jury to impeach its original verdict, accept a different verdict, and enter judgment in accordance with that different verdict.

[¶ 2] Ryan A. Hurd appeals from a judgment of conviction of aggravated operating under the influence (OUI) (Class C), 29-A M.R.S. § 2411(1–A)(D)(1) (2007 & 2009),[1] entered in the Superior Court (Franklin County, *Murphy, J.*) following a jury trial. Hurd argues that the court

---

1. Title 29–A M.R.S. § 2411(1–A)(D)(1) has not been amended since the pertinent time, October 2007, but, relevant to this case, that section cross-references section 2411(1–A)(A), to which clarifying amendments were made by P.L.2009, ch. 447, § 37 (effective Sept. 12, 2009).

erred in: (1) instructing the jury as to accomplice liability on the charge of aggravated OUI; and (2) allowing the jury, after rendering a verdict of not guilty on the charge of aggravated OUI and being discharged, to reconvene and, after further inquiry by the trial court, change its verdict to guilty. Hurd also challenges the jury's not being instructed on a defense to liability as an accomplice and the sufficiency of the evidence to support the verdict.

[¶ 3] Because, after accepting a not guilty verdict and discharging the jury, the court could not question the jury further about its verdict, reconvene the jury, conduct a further inquiry of the jury, and accept a guilty verdict in place of the not guilty verdict, we vacate the judgment.

## I. CASE HISTORY

### A. Facts

[¶ 4] Viewing the evidence in the light most favorable to the State, the jury rationally could have found the following facts beyond a reasonable doubt. *See State v. Bruzzese*, 2009 ME 61, ¶ 2, 974 A.2d 311, 311–12.

[¶ 5] Ryan Hurd, Chad Bernier, and their foreman, Terry "TJ" Richardson, were working together on a construction project in Franklin County. After work on October 16, 2007, the three men, who were staying in Kingfield, had a cookout behind their motel and began drinking beer and hard liquor. When they ran out of liquor, Hurd drove them in his car, a two-door Pontiac Grand Prix, to Farmington. There they bought some beer and then went to a bar.

[¶ 6] At the bar, all three men appeared intoxicated, though to some observers in the bar, Hurd appeared the most intoxicated.[2] As the men were getting ready to leave the bar, a patron overheard them decide that Hurd would drive. However, no one saw who was actually driving when the car left the parking lot, and one or more bar patrons had told Richardson that he should drive because Hurd was not "good enough to drive."

[¶ 7] As the driver was attempting to return to Kingfield, speeding in excess of ninety miles per hour, he lost control of the car in New Vineyard. The car left the road; hit a utility pole on the driver's side near the steering column, breaking the pole off; hit a tree stump; and came to rest on its roof.

[¶ 8] Rescuers arriving at the scene found Richardson deceased on the driver's side of the car. Bernier, badly injured, was in the back seat. Hurd was apparently ejected from the vehicle and walked to a nearby house from where the owner called 911, triggering the emergency response.

[¶ 9] In the hours and days following the accident, Hurd, and later Bernier, gave several conflicting statements as to who was driving the vehicle at the time of the accident. Hurd said, variously, that (1) Bernier had been driving while Hurd sat in the backseat; (2) Richardson had been driving while Hurd was in the front passenger seat; (3) Hurd had been driving even though he did not really want to drive; (4) Hurd was pretty sure that he had pulled over and then someone else "took over"; (5) Hurd had been driving "at some point"; (6) last Hurd knew, Richardson was driving; and (7) Hurd did not know or did not remember who was driving at the time of the crash.

[¶ 10] According to Bernier's statements to police and subsequent trial testimony, Richardson drove Hurd's car when

---

**2.** Blood tests conducted after the accident indicated that, at around the time of the accident, both Richardson and Hurd had blood-alcohol levels of .22% or greater.

they left the bar to return to Kingfield, but they stopped to change direction, at which point Hurd insisted on driving. Bernier believed that Richardson and Hurd traded seats, and then Hurd drove the car.

## B. Procedural History

[¶ 11] Hurd was indicted for one count of manslaughter (Class A), 17–A M.R.S. § 203(1)(A) (2009); one count of aggravated OUI (Class C), 29–A M.R.S. § 2411(1–A)(D)(1); and one count of OUI (Class D), 29–A M.R.S. § 2411(1–A)(A), (5)(A)(3)(a)(i) (2007).[3] He entered a plea of not guilty. A six-day jury trial was held beginning May 12, 2009. The State dismissed the third count of the indictment, OUI (Class D), on the first day of trial.

[¶ 12] There was no dispute at trial that the car belonged to Hurd. However, there was considerable dispute in the testimony of both fact witnesses and accident reconstruction experts as to whether Hurd or Richardson was driving the car at the time of the accident. The evidence in the record would support a finding that either Richardson or Hurd was driving.

[¶ 13] The day before the case went to the jury, the parties discussed jury instructions with the court. The court granted, over Hurd's objection,[4] the State's request that the jury be instructed that voluntary intoxication is not a defense to manslaughter or to aggravated OUI.[5] The court also granted the State's request for an instruction on accomplice liability as to the aggravated OUI charge. The accomplice instruction request was based on the theory that, according to certain of Hurd's

statements to police and medical personnel, Hurd had been driving his car when the men left the bar, and then switched seats with Richardson, aiding Richardson in the commission of the crime of aggravated OUI. Hurd objected to the accomplice instruction.

[¶ 14] Both parties and the court were active in the fashioning and approval of the instructions submitted to the jury. As to Count II, the court instructed the jury as to the elements of the OUI charge. The court then advised the jury that a person may commit aggravated OUI as a principal or as an accomplice and instructed the jury that if it concluded that the State had failed to prove all elements of aggravated OUI, the jury must then consider if the State has proved Hurd's guilt for aggravated OUI as an accomplice.

[¶ 15] The key elements of the court's instruction were as follows:

Count II is the charge of aggravated OUI. In Maine, a person commits aggravated operating under the influence if that person operates a motor vehicle, is under the influence of intoxicants, or has a blood alcohol level of .08 percent or more at the time of the operation, and, in fact, causes serious bodily injury or death to another person.

Now, a person may also commit aggravated OUI in Maine as an accomplice. Please note that accomplice liability is not available to the State in this case as to the charge on Count I, Manslaughter. But a person in Maine may also commit aggravated OUI as an ac-

---

3. Title 29–A M.R.S. § 2411(1–A)(A), (5)(A)(3)(a)(i) was subsequently amended by P.L.2009, ch. 447, §§ 37, 41 (effective Sept. 12, 2009) (clarifying the manner in which blood-alcohol levels are determined).

4. Hurd objected on the grounds that the evidence at trial did not generate the instruction.

5. At the State's request, the court instructed the jury, over Hurd's renewed objection, only that voluntary intoxication is not a defense as to the element of recklessness in a crime involving that element.

complice; therefore, if you find that the State has failed to prove ... beyond a reasonable doubt all three of the elements of aggravated OUI, as I've just described, you must then consider if the State has proven beyond a reasonable doubt the defendant's guilt as an accomplice to aggravated OUI.

[¶ 16] The court then proceeded to describe the elements of the crime of aggravated OUI as an accomplice.

[¶ 17] Neither party requested that the court advise the jury that if the jury was unanimous that the State had proved the elements of aggravated OUI beyond a reasonable doubt on either principal or accomplice liability theories, it could return a verdict of guilty, even if the jurors were not in agreement as to whether guilt was based on principal or accomplice liability. Instead, the jurors appeared to have been advised to decide the liability as a principal question first and, if they were not in agreement that liability as a principal was proved beyond a reasonable doubt, to then proceed to consider the accomplice liability issue. No objection was raised to the verdict return procedure to be utilized in which the verdict would be returned by the clerk asking the jury if its verdict was guilty or not guilty on each count. A verdict form was not used, and no one indicated that the jury should be asked a separate question regarding accomplice liability.

[¶ 18] After the jury announced it had reached a verdict, the jury returned to the courtroom where the verdict was taken by responses to questions posed orally by the clerk.

[¶ 19] As to Count I, manslaughter, the foreperson reported a verdict of "not guilty." The clerk then asked the jury for its verdict with respect to Count II of the indictment, the count of aggravated OUI. The foreperson replied, "not guilty." There was then some disturbance in the courtroom and apparently certain spectators began sobbing.[6] In response to a question by the clerk, the jury acknowledged that these were its verdicts. The court then thanked the jurors for their service, expressed regret that at points the trial had been interrupted, and discharged them from any further obligation to serve as jurors for five years. The court later reported on the record that the jurors had appeared confused when they were discharged, but that the court believed at the time that the jurors were reacting, perhaps in fear, to the emotional response in the courtroom.[7]

[¶ 20] The jurors left the courtroom and returned to the jury room. Within a minute or two, a judicial marshal reported to the court that the jury needed to speak to the court. The court then entered the jury room and spoke very briefly to the

6. Later comments by counsel to the court indicated that the disturbance and sobbing were by relatives of Hurd. The jury, perceiving the disturbance, would have had no way of knowing whether the spectators causing the disturbance were upset with the verdict or pleased with the verdict.

7. The potential for confusion in reporting the verdict in this case may have been reduced had the court used and explained a written verdict form that could have signaled to the jury that it could report a finding of guilt on the aggravated OUI count if the jury found guilt based on either principal or accomplice liability. Use of written verdict forms is good practice when more than one charge is at issue in a criminal trial and there is any concern that a jury might possibly be confused in reporting a verdict. In addition, after receiving and announcing the verdict, it would be good practice for the court to address the jury directly and ask if the verdict reported by the foreperson or the verdict form correctly and completely reports the jury's verdict.

jury. Shortly thereafter, the jury stated in writing that it "understood there to be 3 charges and wish to speak to that as well." Over Hurd's objection, the court wrote a note back to the jury, asking, "What were the 3 charges you voted on?" The jury replied, "1. Manslaughter 2. Aggravated OUI 3. Accomplice liability." The court understood that to mean that the jury had voted on accomplice liability as though it were a separate count.

[¶ 21] At the State's suggestion, and over Hurd's objection, the court submitted a special verdict form to the jury, asking it to "return to the jury room for further deliberations" to answer specifically whether the jury found Hurd guilty or not guilty of "aggravated operating under the influence" and whether it found Hurd guilty or not guilty of "aggravated operating under the influence—accomplice liability." The court told the jury that it would "wait for [its] further deliberations and [its] verdict in written form on Count II."

[¶ 22] The jury retired for just under nine minutes. The jury stated on the verdict form, which was read in open court, that it found Hurd not guilty of aggravated operating under the influence, but that it found Hurd guilty of "aggravated operating under the influence—accomplice liability." The jury was again discharged. The court entered a judgment of conviction on the count of aggravated OUI.

[¶ 23] On July 10, 2009, Hurd moved for entry of the jury's original verdict of not guilty on the count of aggravated OUI. Hurd argued that the jury impermissibly impeached its own verdict of not guilty on the count of aggravated OUI, that it was discharged and never reimpaneled before rendering its "second" verdict of guilty, and that any further proceedings after the jury rendered its original verdict of not guilty violated Hurd's constitutional rights under the Double Jeopardy Clauses of the United States and Maine Constitutions.

[¶ 24] After the court denied Hurd's motion to reinstate the not guilty verdict and imposed sentence, Hurd brought this appeal.

## C. Arguments on Appeal

[¶ 25] In support of his appeal, Hurd argues that: (1) the law strongly disfavors inquiry into the deliberations of juries; (2) public policy should not permit jurors to impeach their verdicts; (3) we have held that these policy considerations apply to prohibit discharged juries from correcting a mistake in the recording of their verdict, citing *Taylor v. Lapomarda,* 1997 ME 216, 702 A.2d 685, and *Cyr v. Michaud,* 454 A.2d 1376, 1383 (Me.1983); and (4) it is "rank speculation" to assume that the jury did not improperly "revisit its deliberations" after being discharged. Hurd further argues that the jury was never reimpaneled before delivering its "second" verdict and that any further proceedings after the jury delivered its not guilty verdict and was discharged violated his rights under the Double Jeopardy Clauses of the United States and Maine Constitutions.

[¶ 26] In support of the guilty verdict the State argues that: (1) M.R. Evid. 606(b) does not preclude the jury from reporting its unanimous vote, taken, the State asserted, before the jury was discharged, on the theory of accomplice liability; (2) the jury did not misunderstand the jury instructions and properly considered and voted upon both theories of liability for aggravated OUI prior to being discharged; (3) the civil cases cited by Hurd in his memorandum are distinguishable from this criminal matter; and (4) case law from other jurisdictions, which address and dispose of the Double Jeopardy and other constitutional concerns, support the State's position.

## II. LEGAL ANALYSIS

[¶ 27] For purposes of analysis in this opinion, we will assume, without extended discussion, that the court's instruction to the jury on principal and accomplice liability could have led the jurors to infer that after announcing the result of their deliberations regarding liability for aggravated OUI as a principal, they would be questioned separately regarding liability for aggravated OUI as an accomplice. While Hurd objected to instructing on accomplice liability, Hurd, the State, and the court all participated in developing, and agreed on, the instruction addressing the approach the jury was to take in considering the aggravated OUI count, and there was no objection that the verdict should be returned by posing two questions to the jury, one for each count, to report its verdict.

[¶ 28] The instruction, implying that the jurors should separately and in order decide first principal liability and then decide accomplice liability only if the jury determined that the State had failed to prove principal liability, was more favorable to Hurd than the law requires.

[¶ 29] A person may be guilty of a crime if he personally does the acts that constitute the crime or if he is an accomplice of another person who actually commits the crime. *State v. Stratton*, 591 A.2d 246, 247–48 (Me.1991). While the jury must be unanimous that the crime was committed, the jury need not be unanimous as to whether the defendant committed the crime as a principal or as an accomplice. *See State v. Nguyen*, 2010 ME 14, ¶¶ 11–16, 989 A.2d 712, 714–15. Thus, the jurors could have been advised that they could return a verdict of guilty on Count II if they all agreed that the crime had been proved, even if some found Hurd guilty as a principal and others found Hurd guilty as an accomplice.[8]

[¶ 30] With this background, we begin our analysis assuming that the court's instruction, though not so intended by the court, and not recognized by the parties, could have been interpreted by the jurors to suggest that they could be asked a third question on accomplice liability. We also assume that the court found, at least inferentially, that the jury, after discharge, was

---

8. We have repeatedly held that if a crime may be committed by more than one means or method, the jury need not be unanimous on the means or method of committing the crime if they are unanimous that the crime was committed—that each element of the crime, committed by whatever means, is proved beyond a reasonable doubt. *See State v. Nguyen*, 2010 ME 14, ¶¶ 11–16, 989 A.2d 712, 714–15 (rejecting "theory unanimity" argument and holding that jury could find defendant guilty as principal or as accomplice); *State v. Elliott*, 2010 ME 3, ¶¶ 21–27, 987 A.2d 513, 520–21 (requiring unanimity on proof of each element of crime, not on facts supporting proof of each element); *State v. Erskine*, 2006 ME 5, ¶¶ 12–19, 889 A.2d 312, 316–18 (holding that conviction may be based on finding of intentional or knowing murder or depraved indifference murder); *State v. St. Pierre*, 1997 ME 107, ¶¶ 5–7, 693 A.2d 1137, 1139 (holding that conviction could be based on either alternative for unlawful sexual conduct); *see also Richardson v. United States*, 526 U.S. 813, 817, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999); *United States v. Hernandez–Albino*, 177 F.3d 33, 40 (1st Cir.1999).

The jury need not separately find a defendant guilty as a principal or an accomplice. Our opinion in *State v. Stratton*, 591 A.2d 246, 247–48 (Me.1991) indicates that the jury in that case was properly asked to decide whether the conviction was based upon principal or accomplice liability. Such an inquiry was appropriate in that case of first impression in deciding whether the law of accomplice liability from the Criminal Code applied to offenses, including operating under the influence, defined in the Motor Vehicle Code. In most cases asking the jury to decide specially whether a finding of guilt is based on principal or accomplice liability can lead to juror confusion and is a practice that is neither necessary nor desirable.

not subject to any outside pressures, communications, or influences.

[¶ 31] The law governing juror communications with the court, after discharge, is articulated in M.R. Evid. 606(b) which states:

**Inquiry into validity of verdict or indictment.** Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that juror's or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning any juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received.

[¶ 32] We recently addressed the importance of this rule, and the limitations it imposes on post-discharge inquiry into jury verdicts in *Ma v. Bryan*, 2010 ME 55, ¶ 9, 997 A.2d 755, 759–60.

We are ... generally barred from inquiring into the jury's deliberations. . . .
The reasons for this rule are compelling: (1) the need for stability of verdicts; (2) the need to conclude litigation and desire to prevent any prolongation thereof; (3) the need to protect jurors in their communications to fellow jurors made in the confidence of secrecy of the jury room; (4) the need to save jurors harmless from tampering and harassment by disappointed litigants; (5) the need to foreclose jurors from

abetting the setting aside of verdicts to which they may have agreed reluctantly in the first place or about which they may in the light of subsequent developments have doubts or a change of attitude.

. . . .

Hence our adoption of M.R. Evid. 606(b), which prohibits a juror from testifying as to any statements made during deliberations or "to the effect of anything upon that juror's or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning any juror's mental processes in connection therewith." With these considerations in mind, we are permitted to inquire into the validity of a verdict only in very limited circumstances, for "serious allegations of juror bias in the context of juror dishonesty or inaccuracy in answering a voir dire questionnaire," for example.

*Id* (citing *State v. Watts*, 2006 ME 109, ¶¶ 15–17, 907 A.2d 147, 150–51).

[¶ 33] While Rule 606(b) states that a juror "may not testify," court opinions over the last century have interpreted this limitation to extend to any post-discharge communication by or with a juror or the jury that would undermine the validity or accuracy of the jury's reported verdict. *See Taylor v. Lapomarda*, 1997 ME 216, ¶¶ 5–10, 702 A.2d 685, 687–89 (holding that the court properly applied Rule 606(b) in declining to disturb the verdict following juror-initiated communications indicating confusion and inaccuracy in reporting verdict); *Marr v. Shores*, 495 A.2d 1202, 1204–06 (Me.1985) (holding that the court properly did not consider, pursuant to Rule 606(b), post-discharge affidavit by jury foreman and separate affidavit by trial counsel regarding communication with another juror alleging references to

insurance during deliberations); *see also Tanner v. United States,* 483 U.S. 107, 116–27, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987) (discussing, pursuant to Fed.R.Evid. 606(b), juror-initiated telephone call and subsequent affidavit alleging intoxication of jurors during trial); *McDonald v. Pless,* 238 U.S. 264, 265–69, 35 S.Ct. 783, 59 L.Ed. 1300 (1915) (discussing juror communication to counsel alleging improper method of calculation of verdict). Thus, the ban on juror testimony regarding the internal deliberation process of the jury or jury confusion or mistake in reporting the verdict is a ban on court consideration of any post-discharge juror communications about such subjects.

[¶ 34] Ninety-five years ago, the United States Supreme Court acknowledged that this strict ban on the use of post-discharge statements by jurors to undermine verdicts could lead to apparently unjust results in particular cases, but that the ban on the use of such juror statements was vital to preserve the integrity of the jury system.

> But let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference.

*McDonald,* 238 U.S. at 267–68, 35 S.Ct. 783.

[¶ 35] In *McDonald,* the court recognized that the rule may exclude the only evidence of juror misconduct, but "a change in the rule would open the door to the most pernicious arts and tampering with jurors.... It would lead to the grossest fraud and abuse and no verdict would be safe." *Id.* at 268, 35 S.Ct. 783.

[¶ 36] The continuing validity of the rule stated in *McDonald,* after adoption of Rule 606(b) in the Federal Rules of Evidence, was reaffirmed in *Tanner,* 483 U.S. at 119–21, 107 S.Ct. 2739. Besides *Taylor,* we have articulated similar policy concerns to exclude juror communications offered to impeach verdicts in *Cyr v. Michaud,* 454 A.2d 1376, 1383 (Me.1983) (considering allegation of juror confusion as to verdict form post-adoption of M.R. Evid. 606(b)) and *Patterson v. Rossignol,* 245 A.2d 852, 857 (Me.1968) (discussing policy considerations pre-adoption of M.R. Evid. 606(b)).

[¶ 37] But for the fact that it was a civil case without a double jeopardy concern, the facts in *Taylor* are very similar to those presented here. In *Taylor,* the jury's responses on its original verdict form indicated a misunderstanding as to the law of comparative negligence. 1997 ME 216, ¶ 3, 702 A.2d at 686. The jury was not discharged, and the court reinstructed the jury and recessed it to deliberate, after which the jury returned a verdict form that was inconsistent with its first verdict. *Id.* ¶ 4, 702 A.2d at 686. After the second verdict was read, the parties said they had nothing further for the jury, the jury was discharged, and the jury left the courtroom. *Id.* Within minutes, a court officer informed the court that the jurors wanted to speak to it because they had intended to award Taylor more than they had and that they had "messed up really bad." *Id.* The jury

indicated in writing that it had misunderstood the verdict form. *Id.*

[¶ 38] Based on the jury's note to the court, the court denied Taylor's motion for a mistrial and for entry of judgment. *Id.* ¶ 4, 702 A.2d at 687. On appeal, we held that upon determining that the jury's verdict was not the result of outside influence or external juror misconduct, the court correctly concluded that there were no grounds for granting Taylor's motions. *Id.* ¶¶ 7, 10, 702 A.2d at 687–89 (noting that Taylor alleged only that the jury's verdict was the product of the jury's failure to understand how to calculate comparative negligence on the verdict form). In reaching this decision, we acknowledged that courts of other jurisdictions have taken a "wide variety of approaches to deciding whether to permit jury reassembly after discharge," concluding that this evidences "the impossibility of drawing a line which properly fits all of the points upon which parties may urge revisiting jury verdicts." *Id.* ¶ 8 n. 4, 702 A.2d at 688.

[¶ 39] Taylor had urged us to make a fact-specific inquiry and conclude that the jury, despite having been discharged, was "still together in the courthouse functioning as a jury" when it sent the note to the court. *Id.* ¶ 7, 702 A.2d at 688. We declined to do so, stating, in language reaffirmed in our recent statement in *Ma*,[9] that such an inquiry would be contrary to our prior precedent and public policy considerations that "militate against permitting jurors to impeach their verdicts":

(1) the need for stability of verdicts; (2) the need to conclude litigation and desire to prevent any prolongation thereof; (3) the need to protect jurors in their communications to fellow jurors made in the confidence of secrecy of the jury room; (4) the need to save jurors harmless from tampering and harassment by disappointed litigants; (5) the need to foreclose jurors from abetting the setting aside of verdicts to which they may have agreed reluctantly in the first place or about which they may in the light of subsequent developments have doubts or a change of attitude.

*Taylor*, 1997 ME 216, ¶ 8, 702 A.2d at 688 (quoting *Patterson*, 245 A.2d at 857).

[¶ 40] Similarly, in *Cyr*, we held that these policy considerations "apply to prohibit correcting a mistake in the recording of a verdict by using evidence, obtained after juror discharge, to establish that the jury misunderstood the verdict form provided to them."[10] 454 A.2d at 1383; *see also* Field & Murray, *Maine Evidence* § 606.2 at 278 (6th ed.2007) ("Maine has joined those jurisdictions that prohibit subsequent juror testimony or affidavits in order to correct a mistake even in the recording of a verdict.").

[¶ 41] Although our prior opinions addressed civil cases, the holdings of those opinions are equally applicable to criminal cases, given that Rule 606(b) applies to both. *Tanner*, 483 U.S. at 121–22, 107 S.Ct. 2739 (explicitly recognizing that Rule 606(b) applies to criminal cases).[11] Other

---

9. *Ma v. Bryan*, 2010 ME 55, ¶ 9, 997 A.2d 755, 759–60.

10. Contrary to the State's argument, *Taylor* and *Cyr* are not distinguishable from this case on the grounds that inquiring post-discharge into the jury's verdicts in those cases would have improperly necessitated revisiting the jury's deliberations, but this case does not. In this case, similar to *Taylor* and *Cyr*, the

jury misreported its intended verdict based on a misunderstanding of the instructions; the inquiry into the deliberative process of the juries, in all three cases, is comparable.

11. Research has disclosed one very old Maine criminal case in which the trial court was held to have properly corrected a verdict based on post-discharge information disclosed by jurors. In *State v. Whittier*, 21 Me. 341

federal precedent with a similar result includes *United States v. Briggs,* 291 F.3d 958, 963–64 (7th Cir.2002); *United States v. Gonzales,* 227 F.3d 520, 524–25 (6th Cir.2000); *United States v. Ford,* 840 F.2d 460, 465 (7th Cir.1988); and *Gov't of the Virgin Islands v. Nicholas,* 759 F.2d 1073, 1079–81 (3d Cir.1985).[12]

[¶ 42] Applying the holdings of these cases, we conclude that the trial court erred when, after discharge of the jury, it inquired into the jury's deliberative process beyond establishing, to the extent permitted by M.R. Evid. 606(b), that the jury's original verdict of not guilty on the count of aggravated OUI was not the product of outside influence or external juror misconduct. In this case, the jury rendered a verdict in open court that responded to both counts of the indictment, counsel did not request a poll or any further inquiry, the jurors then acknowledged the verdict as their verdict and were discharged without any overt indication that there was a problem in the rendering of the verdict. The jurors' subsequent communications with the court establish that their concern over the verdict resulted from the jurors' misunderstanding of the jury instructions and the alternative theories presented for liability on the one count of aggravated OUI, not from outside influences or external juror misconduct.

[¶ 43] Pursuant to *Tanner* and *Taylor,* the inquiry ends there. The dissent recognizes that *Taylor* governs this appeal and suggests that we overrule *Taylor* to allow the trial court to find facts to permit a jury to impeach its own verdict. The facts distinguishing this case from *Taylor* point to the importance of continuing the bright-line rule stated in Rule 606(b). Here, unlike *Taylor,* the jury's announcement of its verdict led immediately to an emotional response in the courtroom. Here, unlike *Taylor,* the trial court perceived that the confusion reflected in the jurors' faces after the verdict may have been based on fear generated by the outburst in the courtroom. The Rule 606(b) ban on post-discharge juror impeachment of their own

(1842), the defendant was charged with two counts of what would today be criminal mischief. The trial court instructed the jury that there was insufficient evidence to support a verdict on the second count. *Id.* at 346. Despite that instruction, the jury returned a verdict of guilty on both counts and was discharged. *Id.* The jury then dined together and afterwards reported to the court that they were mistaken in reporting a guilty verdict on the second count. *Id.* The court then entered a not guilty verdict on the second count, and we, as then constituted, affirmed the change of verdict, holding that this correction was not error as it was consistent with the court's direction before the jury began its deliberations and there was no prejudice to the accused. *Id.* at 346–47. The very special circumstances of that case, and the unanimity of precedent to the contrary over the last century, cause us to restrict the holding in *Whittier* to its unique facts.

**12.** Federal Rule of Evidence 606(b) was amended in 2006 to allow post-discharge ju-

ror testimony that the jury had made a mistake in entering the verdict on the verdict form. The Maine Rule was not similarly changed, and no verdict form was used in reporting the first verdict. Federal Courts continue to bar inquiry into juror thought processes leading to a verdict. *See, e.g., United States v. Davis,* 612 F.Supp.2d 48, 53–54 n. 2 (D.D.C.2009) (holding that Fed.R.Evid. 606(b), as amended, precluded the convicted defendant from questioning jurors about their understanding of the jury instructions and that none of the limited exceptions permitting juror testimony under the amended Rule 606(b) applied), *aff'd,* 377 Fed.Appx. 19 (D.C.Cir.2010); *see also Schuler v. Branch Banking & Trust Co.,* No. 1:08cv378, 2010 WL 1257959, at *1, 2010 U.S. Dist. LEXIS 39012, at *2–3 (March 25, 2010) (denying motion for new trial in civil case, holding that Fed. R.Evid. 606(b), as amended, does not permit post-discharge juror testimony as to the lengthy and confusing nature of the jury instructions).

verdict properly prevents reopening accepted verdicts, after discharge of the jury, in such circumstances.

[¶ 44] After a jury is discharged, no court can then inquire into the extent to which the jurors may have been confused in rendering the verdict, or did or did not remain together and continue to act as a "single body" after being discharged, or whether or not they actually deliberated after being discharged and before contacting the court with concerns about the verdict.[13] The jury reported a verdict on each count, in the manner that the court, the State, and the defense had anticipated; it was discharged and left the courtroom without comment.

[¶ 45] In sum, the trial court exceeded the parameters established in Rule 606(b), and in *Ma, Taylor, Cyr, Marr, Patterson, Tanner,* and *McDonald* when, once it was established that the jury's verdict was not the result of outside influence or external juror misconduct, it made further inquiry into the process by which the jury reached its verdict and allowed the jury to reassemble to report a different verdict after having been discharged.

The entry is:

Judgment of conviction vacated. Remanded for entry of the original verdict of not guilty on Count II.

JABAR, J., with whom SILVER, J., joins, dissenting.

[¶ 46] I respectfully dissent. I begin my analysis from the same factual premise

as the Court, and thus assume that: (1) the jury reasonably interpreted the court's instruction to mean they would be asked a third question on accomplice liability; and (2) after leaving the courtroom, the jury was not subject to any outside pressures, communications, or influences. Given these facts, as well as other undisputed details discussed below, I cannot agree that M.R. Evid. 606(b) prohibits the jury from properly reporting its complete verdict in this case.

[¶ 47] We have, as the Court explains, interpreted Rule 606(b)'s "limitation to extend to any post-discharge communication by or with a juror or the jury that would undermine the validity or accuracy of the jury's reported verdict." *Supra* ¶ 33. As one commenter has noted, "[t]he reasons for [Rule 606(b) ], namely, the dangers of uncertainty and of tampering with the jurors to procure testimony, disappear in large part if such investigation as may be desired is *made by the judge* and takes place *before the jurors' discharge and separation.*" 8 John Henry Wigmore, *Evidence in Trials at Common Law* § 2350, at 691 (McNaughton rev.1961). Here, the jury had not separated, and the circumstances of this case support a conclusion that the jury had not yet been functionally discharged.

[¶ 48] The transcript reveals that, after the jury reported two not guilty verdicts, the following occurred:

THE CLERK: Madam Foreperson, members of the jury, harken to your

---

**13.** Contrary to the State's argument that the jurors in this case voted on the issue of "aggravated OUI—accomplice liability" before being discharged and that they were merely reporting that vote on the special verdict form, the court explicitly instructed the jury after it was discharged to return to deliberate in order to complete the special verdict form. That verdict form was given to the jury only after it had reported its first verdict, was

discharged, and was then reconvened and reinstructed. At several points in this trial, the State had both the burden and the opportunity to seek judicial action that could have avoided the problem here. For example, the jury instruction should have been clarified, and the State could have sought to poll the jurors if there was, in fact, any question about their confusion in reporting their verdict initially.

verdicts. So say you Madam Foreperson, so say you all, ladies and gentlemen?

THE JURY: Yes.

THE COURT: Thank you very much, ladies and gentlemen, you can be seated.

Well, I just want to thank you very much for your service. We know that these cases are often difficult for everyone involved and this was a—a lengthy process interrupted, we know we disrupted your lives to ask you to serve here as jurors in Franklin County. And I just want to tell you once again, we could not run the criminal justice system in this county without the sacrifice of persons such as yourselves.

So once again, because you have served on this jury, you have discharged your obligation to serve as jurors for the next five years. So please know that when you leave here you have our deep gratitude for your service. Please rise for the jury.

(THE JURY LEFT THE COURTROOM AT 4:24 P.M.)

THE COURT: All right. Please be seated. The—the verdicts having been rendered, the—any bail that's been—any bond or any terms of the bail bond are hereby discharged and the bail is exonerated. I am going to speak briefly with the jury to convey my thanks to them personally—

THE JUDICIAL MARSHAL: Oh, Your Honor. They need to see you right now.

THE COURT: Okay. We'll be in recess.

THE CLERK: All rise.

[¶ 49] The court briefly left the courtroom to speak with the jury. Upon returning, the court informed the parties that the jury had been "under the impression that there were three counts." The court also reported that the jury's apparent confusion upon being discharged was not a reaction to the disturbance in the courtroom, but was because the jury "felt that they had been cut off." By this point, only three minutes had elapsed since the jury had left the courtroom.

[¶ 50] The subsequent written communication between the jury and the court reveals that the jury had, in fact, taken three votes. First, the jury informed the court that it "understood there to be 3 charges and wish to speak to that as well." Second, in response to the court's question, "What were the 3 charges you voted on?" the jury replied, "1. Manslaughter 2. Aggravated OUI 3. Accomplice liability." Finally, the jury completed the special verdict form finding Hurd guilty of a third charge, "aggravated operating under the influence—accomplice liability," in less than nine minutes.

[¶ 51] Had the foreman spoken up minutes earlier, prior to the court announcing that members of the jury had "discharged [their] obligation to serve as jurors," we would have no trouble concluding that the jury could have fully reported its verdict. That the outcome of this case rests on such a distinction illustrates the need to examine the issue of discharge closely. To account for the significant implications surrounding the issue, I would adopt a functional approach, and conclude that discharge has not occurred where the jury (1) continues to function as an undispersed unit; (2) is not subject to any outside pressures, communications, or influences; and (3) remains under the control of the court.

[¶ 52] Although the authority is not uniform, this approach has significant support in other jurisdictions. *See, e.g., United States v. Rojas,* 617 F.3d 669, 677 (2d Cir.2010) ("The mere incantation of the word 'discharged' marks only a time when

the jurors have been discharged nominally."); *Quesinberry v. Taylor,* 162 F.3d 273, 278 (4th Cir.1998) (holding that "as long as the jury remains an undispersed unit, within control of the court, the jury had not been finally discharged" (quotation marks omitted)); *United States v. Marinari,* 32 F.3d 1209, 1214 (7th Cir.1994) ("When a jury remains as an undispersed unit within the control of the court and with no opportunity to mingle with or discuss the case with others, it is undischarged and may be recalled."); *Putnam Res. v. Pateman,* 958 F.2d 448, 457 (1st Cir.1992) ("[I]t is the settled rule that the jury 'may remain undischarged ... though discharge may have been spoken by the court, if ... it remains an undispersed unit, within the control of the court.'" (quoting *Summers v. United States,* 11 F.2d 583, 586 (4th Cir.1926))); *State v. Colon,* 272 Conn. 106, 864 A.2d 666, 776 (2004) ("[M]ere departure from the courtroom does not, in and of itself, discharge a jury from its obligation to render continued service in a particular case."); *State v. Rodriguez,* 139 N.M. 450, 134 P.3d 737, 739 (2006) ("The functional approach to determining whether a jury has been discharged requires a determination of whether the jury is still in the presence and control of the trial court, and if not, whether the jury was possibly influenced by an unauthorized contact."); *State v. Green,* 995 S.W.2d 591, 609 (Tenn.Crim. App.1998) (examining cases and concluding that "the verbal discharge or dismissal of the jury by the trial court does not render the jury discharged for purposes of subsequent reassembly to correct or amend a verdict").

[¶ 53] Indeed, with the exception of *Taylor v. Lapomarda,* 1997 ME 216, 702 A.2d 685, each case cited by the Court involves an application of M.R. Evid. 606(b) (or its federal counterpart) to communication by jurors who had clearly been functionally discharged. *See Tanner v. United States,* 483 U.S. 107, 113, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987) (addressing motion filed "[t]he day before petitioners were scheduled to be sentenced"); *McDonald v. Pless,* 238 U.S. 264, 265–66, 35 S.Ct. 783, 59 L.Ed. 1300 (1915) (addressing juror testimony offered in subsequent motion to set aside verdict); *United States v. Gonzales,* 227 F.3d 520, 521 (6th Cir.2000) (addressing juror statement made "[o]ne and a half months after the jury found [the defendant] guilty"); *United States v. Ford,* 840 F.2d 460, 465 (7th Cir.1988) (addressing juror statement made "[e]leven days after the conclusion of [the] trial"); *Virgin Islands v. Nicholas,* 759 F.2d 1073, 1075 (3d Cir.1985) (addressing juror statement made "one year and eight months after the verdict was rendered"); *State v. Watts,* 2006 ME 109, ¶¶ 9–10, 907 A.2d 147, 149 (addressing juror's affidavit filed seven days after the jury returned its verdict); *Marr v. Shores,* 495 A.2d 1202, 1204 (Me. 1985) (addressing two juror affidavits submitted at a subsequent hearing on a motion for a new trial); *Cyr v. Michaud,* 454 A.2d 1376, 1379 (Me.1983) (addressing post-trial juror statement to an uninvolved attorney, brought to the court's attention "[f]our days after the completion of the trial").[14]

[¶ 54] The facts regarding discharge in *Taylor* are admittedly similar to this case. There, after the jury reported its verdict, the court "discharged the jury, and the jury left the courtroom." *Taylor,* 1997 ME 216, ¶ 4, 702 A.2d at 686. Minutes later, the jury officer informed the court

---

**14.** Although we referenced the policy concerns surrounding MR. Evid. 606(b) in *Ma v. Bryan,* 2010 ME 55, ¶ 9, 997 A.2d 755, 759– 60, that case involved only a challenge to the sufficiency of the evidence to support the jury's verdict.

that the jury wished to speak to it, indicating that members of the jury had stated that they intended to award the plaintiff more then they had. *Id.* The court ultimately denied the plaintiff's motion for a mistrial, reasoning that the verdict "should not be disturbed as a result of the communication from the jury after it was discharged." *Id.* ¶ 4, 702 A.2d at 687 (quotation marks omitted).

[¶ 55] On appeal, we affirmed the trial court's decision denying the motion for a mistrial. *Id.* ¶ 6, 702 A.2d at 687. In doing so, we declined to engage in a "fact-specific inquiry" regarding discharge, deeming such an inquiry "neither wise nor desirable." *Id.* ¶ 7, 702 A.2d at 688. We further noted that the "wide variety of approaches to deciding whether to permit jury reassembly after discharge" demonstrated "the impossibility of drawing a line which properly fits all of the points upon which parties may urge revisiting jury verdicts." *Id.* ¶ 8 n. 4, 702 A.2d at 688.

[¶ 56] I am convinced that a fact-specific inquiry into the issue of discharge is essential. As this case illustrates, the possibility of miscommunication between the court and a jury of untrained and inexperienced individuals is a practical reality of the trial process. The jury was instructed that there were two ways to commit the crime of aggravated OUI:

> But a person in Maine may also commit aggravated OUI as an accomplice; therefore, if you find that the State has failed to prove—prove beyond a reasonable doubt all three of the elements of aggravated OUI, as I've just described, *you must then consider* if the State has proven beyond a reasonable doubt the defendant's guilt as an accomplice to aggravated OUI.

(Emphasis added.) As presented, this instruction resembles a lesser-included offense instruction, *see* 17–A M.R.S. § 13–A (2009), in which a jury may answer two questions regarding a single count. This is exactly what the jury did in this case. The jury was not confused; they followed the instructions that had been presented.[15] After a six-day trial, conducted over a sixteen-day period, the jury reached a verdict. However, applying the Court's bright-line test, the jury's hesitation regarding the proper time to report its full verdict is now controlling on the issue of discharge, and, ultimately, the outcome of this case.

[¶ 57] Conversely, taking a functional approach to the issue of discharge accounts for the realities of managing a jury, while preserving the integrity of the deliberative process. Trial courts are regularly called upon to exercise discretion in matters involving jury management during the course of a lengthy trial. Drawing a bright line on the issue of discharge removes the traditional discretionary role accorded to the trial court. In circumstances where a jury (1) continues to function as an undispersed unit; (2) is not subject to any outside pressures, communications, or influences; and (3) remains under the control of the court, we should give trial courts the discretion to correct obvious mistakes. Although the fact-sensitive nature of such an approach is less convenient, it is far more suited to our jury-trial system.

---

**15.** As the Court notes, the aggravated OUI accomplice liability instruction actually inured to Hurd's benefit. The jury was instructed to consider accomplice liability separately, and only if it first determined that the State had not proved principal liability. This is contrary to our precedent, which holds that a jury need not be unanimous as to whether the defendant committed a crime as a principal or an accomplice. *See State v. Nguyen*, 2010 ME 14, ¶¶ 11–16, 989 A.2d 712, 714–15.

[¶ 58]  Constitutional law does not compel a different standard.  Courts have routinely concluded that applying a functional approach to the issue of discharge does not violate a criminal defendant's constitutional rights, including due process, the right to a jury trial, and protection from double jeopardy.  *See United States v. Stauffer,* 922 F.2d 508, 513–14 (9th Cir.1990) (holding that the defendant's right to be free from double jeopardy had not been violated where the trial court "simply corrected the verdict form to reflect the [discharged] jury's true intent"); *Brown v. Gunter,* 562 F.2d 122, 124–25 (1st Cir.1977) (finding nothing in the "United States Constitution prevent[ing] the states from adopting rules allowing a discharged but still isolated jury to correct its verdict in a criminal case after a verdict has been recorded and the jury has been discharged"); *accord State v. Milliken,* 2010 ME 1, ¶ 16, 985 A.2d 1152, 1157–58 (stating that "federal and Maine due process rights are coextensive"); *State v. Hughes,* 2004 ME 141, ¶ 3, 863 A.2d 266, 268 ("The double jeopardy provisions of both the United States and Maine Constitutions are co-extensive.").

[¶ 59]  To the extent that *Taylor* precludes a functional approach to determining the moment of discharge, I believe we should overrule it.[16]  *See Eaton v. Town of Wells,* 2000 ME 176, ¶ 53, 760 A.2d 232, 249 (Saufley, J., concurring) ("Although it is the policy of the courts to abide by precedent and not to disturb a settled point, the doctrine of *stare decisis* does not require a 'mechanical formula of adherence to the latest decision.'" (quoting *Adams v. Buffalo Forge Co.,* 443 A.2d 932, 935 (Me. 1982))); *Shaw v. Jendzejec,* 1998 ME 208, ¶ 9, 717 A.2d 367, 371 (listing the "guiding principles pursuant to which a prior deci-

sion may and should be overruled").  Despite the significant implications flowing from a determination of discharge, *Taylor*'s bright-line rule requires the Court to ignore compelling factual circumstances.

[¶ 60]  In sum, I would conclude that the jury had not been discharged and that the court properly acted to allow the jury to report its complete verdict.  Although the policy considerations that "militate against permitting jurors to impeach their verdicts" are well founded, *see Taylor,* 1997 ME 216, ¶ 8, 702 A.2d at 688, they are not furthered by the result reached in this case.  On these facts, a different consideration is more compelling: "the societal interest in punishing one whose guilt is clear after he has obtained [a fair] trial." *Brown,* 562 F.2d at 125 (quoting *United States v. Tateo,* 377 U.S. 463, 466, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964)).  Accordingly, I would affirm the judgment.

---

16.  Although we should overrule *Taylor*'s holding regarding the issue of discharge, I also believe *Taylor* is distinguishable because the jury in *Taylor* sought to change its verdict, whereas the jury here failed to fully report its verdict.